[Sac. No. 5962. In Bank. Aug. 2, 1950.]

ELDEN W. CLEMENT, Appellant v. THE STATE
RECLAMATION BOARD et al., Respondents.

Earl D. Desmond, E. Vayne Miller and Hudson Ford for Appellant.

Fred N. Howser, Attorney General, Walter S. Rountree, Timothy W. O'Brien and Robert E. Reed, Deputy Attorneys General, C. C. Carleton and Henry Holsinger for Respondents.

TRAYNOR, J.—In an action in inverse condemnation under article I, section 14 of the California Constitution,[†] plaintiff alleged that his farm land had been damaged by defendants' construction and maintenance of a flood control project on the east bank of the Sacramento River north of the city of Colusa. The complaint was in two counts. The first alleged a taking or damaging of private property for a public use. The second alleged that the damage to the property resulted from the negligent maintenance of the project. Motions for nonsuit were granted to the individual members of the State Reclamation Board, and the cause was tried against the State of California and the state agencies charged with the maintenance and control of the project. The jury returned a verdict for defendants, and plaintiff appeals from the judgment entered thereon.

Plaintiff's farm is located in the Butte Basin of the Sacramento Valley about a mile and a half northeast of Colusa, and a quarter of a mile east of the east bank of the Sacramento River. It is rectangular in shape, 998.7 feet wide and about a mile in length, and its longitudinal axis extends east and west. During the early settlement of Colusa County, riparian owners cooperated in the construction of flood control dikes and levees along the east bank of the Sacramento River. By 1870 a series of levees 72 feet high along the east bank protected the lands in the Butte Basin, including that now owned by plaintiff, from the waters of the Sacramento River at normal flood stage. During the first few years of their maintenance two major breaks occurred in the levees. One, the "DeJarnatt Break," was about three miles south of Colusa; the other, the "Moulton Break," was about 12 miles north of Colusa. Thereafter, several minor breaks occurred in the levees, some of them directly opposite the lands of plaintiff. At flood stage, the waters of the river passed through the

[†]"Private property shall not be taken or damaged for public use without just compensation having first been made to, or paid into court for, the owner . . ."

several breaks in the levee and flowed into the Sutter and Butte Basins generally without overflowing the levees. Plaintiff's land was subject to inundation whenever water collected in the Butte Basin. He contends, however, that this inundation was caused by the over-all rise of water in the basin and not by the direct flow of flood water from the river and that he was able to farm his property until 1940.

Shortly after the construction of the farmer levees, the federal government took the first steps toward flood control and reclamation in the Sacramento Valley. In 1893 the California Debris Commission was created by an Act of Congress to accomplish flood control and restore navigation in the Sacramento River. In 1913 the Legislature formed the State Reclamation Board and the Sacramento-San Joaquin Drainage District, defendants herein, vesting them with broad powers over all flood control matters relating to the Sacramento and San Joaquin Rivers and their tributaries. Further reclamation work was forbidden unless approved by these agencies. Pursuant to a comprehensive plan of flood control formulated by these agencies in cooperation with the California Debris Commission and the United States Engineers, the latter undertook construction of the project. The cost was shared equally by the federal government and the state. The state furnished the necessary rights of way, purchased flowage rights wherever necessary, and undertook the maintenance of each part of the project as it was completed.

By 1932 the project was completed from the northern boundary of Colusa County south to the confluence of the Sacramento River and San Francisco Bay. In that year the Moulton and DeJarnatt Breaks were closed by levees. The channel of the Sacramento River north of plaintiff's property was deepened and widened and its carrying capacity increased from an undetermined but substantially smaller capacity to 145,000 cubic feet of water per second. South of plaintiff's property, the narrower channel of the river had a maximum carrying capacity of 65,000 cubic feet of water per second. Under these circumstances no system of levees without relief openings could be constructed within the limits of reasonable engineering. To provide a relief opening to carry off 80,000 cubic feet of water per second before the flow of the Sacramento River reached its narrower channel to the south, the Colusa Weir was constructed by cutting the 62-year old farmer levee to a height of 61.8 to 64 feet leaving the levee north and

south of the cut at 72 feet. The south end of the 1650-foot wide cut lay about 500 feet northwest of the northwest corner of plaintiff's farm. The cut was surfaced with concrete, and parallel levees known as training levees were built at its north and south ends, which extended eastward for about a mile and gradually widened out so that at their termini they were about half a mile apart. The north boundary of plaintiff's farm ran parallel to the south training levee, being separated therefrom by an 80-foot wide strip of land through which ran a ditch or borrow pit caused by the excavation of dirt to build the training levee. The northeast corner of plaintiff's land was directly opposite the east terminus of the south training levee. The training levees were designed to direct the water flowing over the surfaced cut into the Butte Basin to the east where it would fan out and thereby relieve the flow and pressure on the main river levees.

From the Colusa Weir to the end of the training levees, the downward gradient is about 9 feet per mile, abruptly levelling off at the mouth of the weir, thus decreasing the high velocity of the water flowing over the cut, caused by the deepened channel of the river to the north and the steep gradient between the training levees. As a result of the decreased velocity, the carrying capacity of the water was substantially reduced, and as the water began to fan out at the mouth of the weir it deposited silt and sand in the form of an alluvial fan or delta that by the winter of 1939-1940 had reached a sufficient height to impede and divert the flow of water pouring over the cut and through the weir to the east. The flow was no longer permitted to fan out into the basin but was diverted by the delta at the mouth of the weir so that it flowed between the delta and the termini of the training levees. The water that flowed between the delta and the end of the south training levee, instead of flowing out into the basin, backed up and overflowed the east end of plaintiff's farm. Plaintiff alleges that the water deposited sediment and debris at the east end of his farm, forming a delta thereon that made farming impossible on that part of his property after 1940. It is also alleged that the high velocity flow cut channels over the east part of the farm and filled the borrow pit between the farm and the training levee, turning back toward the river and spilling over onto the central portion of plaintiff's property, cutting new channels and depositing silt thereon. It is alleged that as a result of this

diversion of the water onto his land, plaintiff's farm depreciated in value from $30,000 to $8,000.

Plaintiff assigns as error certain instructions* given by the trial court with respect to defendants' right under the "common enemy doctrine" to construct flood control projects without incurring liability to private landowners for damage to their land caused thereby.

By the challenged instructions, the jury was instructed that the natural banks of the Sacramento River were the walls of the river channel cut by the action of the flowing water without reference to artificial dikes or levees constructed thereon before 1870 by riparian owners; that the natural stream waters were only those waters that were contained by the natural banks of the river as defined by the court and did not include waters that would have been contained by the farmer levees; and that all waters that would have overflowed the natural banks of the river were flood waters. On

---

*"The phrase 'natural bank' as used by the Court in these instructions, means the elevation of the surface of the ground which confines the stream within its natural channel, and which was formed by action of the flowing water, exclusive of artificial enbankments or levees."

"The Court instructs you that for the purposes of this case natural stream waters comprise those waters which are capable of being retained within the natural banks of the Sacramento River and not assisted by artificial levees upon or near the banks."

"The Court further instructs you that for the purpose of this case waters in excess of natural stream waters as defined by the Court, but retained within the leveed channel by means of artificial levees or embankments constitute flood waters."

"You are hereby instructed that there was no obligation on the part of the defendants or any of them to maintain levees on the Sacramento River for the protection of plaintiff."

"As to the levees along the Sacramento River in existence before the construction of the Colusa Weir, you are instructed that the plaintiff had no right to have the same maintained for his benefit, or maintained at all. The causing of an opening to be made in such levees in connection with the construction of the Colusa Weir was no invasion of any right of the plaintiff if the effect thereof was merely to permit an outlet for the flow of flood water from the Sacramento River."

"If you find that waters flowing over the Colusa Weir were not waters which would have been confined to the channel of the Sacramento River by the natural banks thereof exclusive of any artificial levees, you are instructed that such waters were flood waters. Flood waters of the Sacramento River, as so defined, are a common enemy, as to which the law recognizes the right of every landowner to protect his lands by all reasonable means, even though damage may thereby be inflicted upon his neighbor."

"If in this case you find that the state did nothing more than a private landowner might have done on his own property without liability, as set forth in these instructions, you are instructed to find for the defendants."

the basis of these definitions, the court instructed the jury that if the water flowing over the Colusa Weir was flood water that would have overflowed the natural banks had the farmer levees never been constructed, damage caused thereby was not compensable; that defendants' liability under article I, section 14 was limited to damage caused by the river waters only if the cutting of the levee and the construction of the Colusa Weir cut away the natural banks of the river and allowed the natural stream waters to escape, and if the alleged damage was caused by the diversion of the natural stream waters. After the jury had retired, they requested a clarification of these instructions, which were then repeated and summarized by the trial court as follows: "If you don't understand that, in so many words it is this: If the defendants in this case caused the natural stream water of the river to flow onto the lands of the plaintiff they would be liable; if they didn't, they wouldn't."

 Plaintiff contends that the challenged instructions in effect erroneously directed a verdict for defendants. He does not attack the instruction explaining the common enemy doctrine to the jury, but he objects to the definitions upon which the instruction was based. In his view, the construction of the farmer levees in 1870 and their continued maintenance until 1932 created a new natural condition, in effect making the channel between the farmer levees a new natural channel and the waters contained by those levees the natural stream waters of the Sacramento River. He contends that the jury should have been instructed that if the water causing the damage to his land was the natural stream water as he defines it, that damage is not covered by the common enemy doctrine and is compensable under article I, section 14. He asserts that the common enemy doctrine immunizes defendants from liability only for damage resulting from the inundation of his land by flood waters, i.e., waters that would not have been contained by the farmer levee before it was lowered in the construction of the Colusa Weir. We conclude that the trial court's instructions were based on an erroneous definition of terms as applied to the facts of the present case, and that they precluded the jury from determining whether plaintiff's land was damaged by waters against which he was entitled to the protection of the farmer levee.

 It is well established that the flood waters of a natural watercourse are a common enemy against which the owner of

land subject to overflow by those waters may protect his land by the erection of defensive barriers, and that he is not liable for damage caused to lower and adjoining lands by the exclusion of the flood waters from his own property, even though the damage to other lands is increased thereby. If he obstructs the natural channel of the river, however, or creates a new artificial channel by which the natural stream waters of the river are carried onto the lands of another that would have been protected therefrom but for the creation of the artificial channel, he is liable for damage resulting therefrom. (*Weinberg Co.* v. *Bixby,* 185 Cal. 87, 95 [196 P. 25]; *Everett* v. *Davis,* 18 Cal.2d 389, 393 [115 P.2d 821]; *McDaniel* v. *Cummings,* 83 Cal. 515, 520 [23 P. 795, 8 L.R.A. 575]; *Seufert* v. *Cook,* 74 Cal.App. 528, 537 [241 P. 418]; *Jones* v. *California Development Co.,* 173 Cal. 565, 575 [160 P. 823, L.R.A. 1917C 1021]; *LeBrun* v. *Richards,* 210 Cal. 308, 314 [291 P. 825, 72 A.L.R. 336]; *McCarthy* v. *Standish,* 63 Cal.App. 457, 462 [218 P. 1025].)

It is settled that the flood waters of the Sacramento River are a common enemy against which proper flood control measures may be taken without liability for damage caused thereby. (*Gray* v. *Reclamation District No. 1500,* 174 Cal. 622, 637 [163 P. 1024]; *Lamb* v. *Reclamation Dist.,* 73 Cal. 125, 133 [14 P. 625, 2 Am.St.Rep. 775]; *Perkins* v. *Blauth,* 163 Cal. 782, 790-792 [127 P. 50]; *Seufert* v. *Cook,* 74 Cal. 528, 537 [241 P. 418].)

Action that may be taken for his own protection without liability by an individual landowner may be taken by the state for the protection of all the landowners in an area without liability under article I, section 14 for damage caused thereby. (*Archer* v. *City of Los Angeles,* 19 Cal.2d 19, 24 [119 P.2d 1]; *O'Hara* v. *Los Angeles County Flood Control Dist.,* 19 Cal.2d 61, 63 [119 P.2d 23]; *House* v. *Los Angeles County Flood Control Dist.,* 25 Cal.2d 384, 388 [153 P.2d 950]; *Gray* v. *Reclamation Dist.,* 174 Cal. 622, 638 [163 P. 1024]; *San Gabriel Valley Country Club* v. *County of Los Angeles,* 182 Cal. 392, 406 [188 P. 554, 9 A.L.R. 1200].) "The liability of the state under article I, section 14 of the California Constitution arises when the taking or damaging of private property is not so essential to the general welfare as to be sanctioned under the 'police power' [citations], and the injury is one that would give rise to a cause of action on the part of the owner independently of the constitutional provision. [Citations.] The provision permits an action against

the state, which cannot be sued without its consent. It is designed, not to create new causes of action, but to give a remedy for a cause of action that would otherwise exist. The state is therefore not liable under this provision for an injury that is *damnum absque injuria*. If the property owner would have no cause of action were a private person to inflict the damage, he can have no claim for compensation from the state. [Citations.] In the present case, therefore, plaintiffs have no right to compensation under article I, section 14, if the injury is one that a private party would have the right to inflict without incurring liability.'' (*Archer* v. *City of Los Angeles, supra,* p. 24; *United States* v. *Sponenbarger,* 308 U.S. 256, 266 [60 S.Ct. 225, 84 L.Ed. 230] ; *Jacobs* v. *United States,* 290 U.S. 13, 16 [54 S.Ct. 26, 78 L.Ed. 142] ; *Weck* v. *Los Angeles County Flood Control Dist.,* 80 Cal.App.2d 182, 193 [181 P.2d 935] ; *Stone* v. *Los Angeles County Flood Control Dist.,* 81 Cal.App.2d 902, 912 [185 P.2d 396] ; *Lamb* v. *Reclamation Dist.,* 73 Cal. 125, 133 [14 P. 625, 2 Am.St.Rep. 775].) Since the common enemy doctrine protects defendants from liability only to the extent that the waters carried onto plaintiff's land were flood waters, the propriety of the challenged instructions depends upon the correctness of the definitions of flood water'' and ''natural stream water'' upon which those instructions were based. ■ Plaintiff can assert no right to recovery for damage caused by water that would have overflowed the natural banks of the river even if the Colusa Weir had not been constructed. Injury caused thereby is *damnum absque injuria* even though it results in part from the increased velocity of the waters caused by the deepening of the channel in the construction of the project (*Archer* v. *City of Los Angeles, supra,* 19 Cal.2d 19, 25, and cases cited therein), since plaintiff must protect his own land from vagrant flood waters excluded from the lands of others by the construction of protective barriers, and he can assert no right to recovery of damages when the injury has resulted from his failure to take proper measures therefor. (*Archer* v. *City of Los Angeles,* 19 Cal.2d 19, 25-26 [119 P.2d 1] ; *Weinberg Co.* v. *Bixby,* 185 Cal. 87, 108 [196 P. 25].)

■ If, however, the construction of a flood control project diverts natural stream waters onto the land of a private owner and causes damage thereto, that property is as much taken or damaged for a public use for which compensation must be paid as if it were condemned for the construction of a highway

or a school. The propriety of the challenged instructions therefore turns upon whether the trial court correctly defined the "natural banks" and "natural stream waters" of the Sacramento River.

■ It is true, as defendants assert, that the farmer levees are not the original banks of the Sacramento River. It is also true that the "fact that a landowner avails himself of the right to repel vagrant waters of a river by embankment does not, *in the absence of some further circumstances or set of circumstances,* impose upon him any obligation to maintain such obstruction, or to refrain from restoring natural conditions." (*Weinberg Co.* v. *Bixby,* 185 Cal. 87, 101 [196 P. 25]. Italics added.) It does not follow, however, that the state may without liability tear out a protection that has existed for 62 years to the lands of plaintiff upon which substantial sums have been expended in reliance upon the continuance of the protection. (*House* v. *Los Angeles County Flood Control Dist.,* 25 Cal.2d 384 [153 P.2d 950].) In view of the long continued maintenance of the levees, together with the expenditure of substantial sums in farm investments in reliance thereon, the levees came to be the natural banks. The waters they contained before the whole project was completed and the Moulton and DeJarnatt Breaks closed must be regarded as natural stream waters that cannot be diverted onto the lands of another to his detriment without liability therefor. "Where the creator of the artificial condition intended it to be *permanent,* and a community of landowners or water users has been allowed to adjust itself to the presence and existence of the artificial watercouse or other artificial condition, acting upon the supposition of its continuance, and this has proceeded for a long time beyond the prescriptive period, the new condition will be regarded as though it were a natural one, its artificial origin being then disregarded by the law as it has been by the community." (I Wiel, Water Rights in the Western States (3d ed. [1911], § 60, p. 59.) "A change in the flow of a stream that appears to be permanent usually leads to costly adjustments by those interested, as they come to regard the artificial condition as permanent. It is therefore reasonable that they should receive as much protection as if the condition were natural." (*Natural Soda Products Co.* v. *City of Los Angeles,* 23 Cal. 2d 193, 197 [143 P.2d 12]; *People* v. *City of Los Angeles,* 34 Cal.2d 695, 698 [214 P.2d 1]; *Chowchilla Farms, Inc.* v. *Martin,* 219 Cal. 1, 18 [25 P.2d 435]; *Matheson* v. *Ward,* 24 Wash. 407, 411 [64 P. 520, 85

Am.St.Rep. 955]; *Kray* v. *Muggli*, 84 Minn. 90, 96 [86 N.W. 882, 87 Am.St.Rep. 332, 54 L.R.A. 473]; *Shepardson* v. *Perkins*, 58 N.H. 354, 356; *Popham* v. *Holloron*, 84 Mont. 442, 451 [275 P. 1099]; *Smith* v. *Youmans*, 96 Wis. 103, 109-110 [70 N.W. 1115]; *Hammond* v. *Antwerp Light & Power Co.*, 132 Misc. 786 [230 N.Y.S. 621, 635].) If the rule were otherwise, landowners in the area would have no recourse for damage caused by the complete destruction of the farmer levees.

The present case is distinguishable from *Weinberg Co.* v. *Bixby*, 185 Cal. 87 [196 P. 25], on which defendants rely. The damage there considered was caused by flood waters and the defendants were held free from liability because they had done nothing more than to repel those waters from their own land, action protected by the common enemy doctrine. In protecting their own land from inundation, they cut a dike that had been constructed only ten years before. The dike had afforded insubstantial protection during the years of its maintenance and had been periodically washed out by heavy rains. Its existence was more a hazard to the lands in the area than a useful barrier. There was neither allegation nor proof that any expenditures or investments had been made in reliance on this insecure barrier during the short period of its maintenance, nor was there any evidence from which it could be inferred that the damage complained of would not have occurred had the dike not been cut. Under those circumstances, it was properly held that defendants were under no duty to maintain the dike and that the reopening of the old outlet was not actionable. ▇ It is clear that a landowner is not deprived of the protection of the common enemy doctrine by his failure to maintain a faulty and insecure barrier in the construction of protective levees. It does not follow, however, that there is no duty not to destroy the barrier when it has proved substantially secure, has been maintained for more than 60 years, and substantial sums have been expended in reliance upon its continued maintenance.

▇ The construction of the Colusa Weir was not an independent project by which a continuous flood control barrier was cut. The construction of the weir was coincident with the closing of the Moulton and DeJarnatt Breaks to provide a relief opening for the protection of the levees. Damage caused thereby is therefore not actionable unless the cutting of the weir caused more water to flow into the Butte Basin

than would have flowed through the Moulton and DeJarnatt Breaks before they were closed. There was ample evidence to support defendants' contention that, even if it is assumed that plaintiff's land was damaged by the inundation, the damage is not attributable to defendants' construction of the Colusa Weir but to the flood action of the Sacramento River that would have caused the damage if the Moulton and De-Jarnatt Breaks had not been closed and the Colusa Weir had not been constructed. Before the construction of the flood control project, the Sacramento River during flood season periodically overflowed the banks of its channel and poured through the Moulton and DeJarnatt Breaks at an elevation substantially lower than that of the Colusa Weir. The result was that all the lands in the Butte Basin, including that of plaintiff, were only partially protected by the farmer levees and were periodically inundated by the flood waters of the river flowing through the breaks. The owners of the lands in the basin could have closed the breaks but, had they done so, the river would inevitably have forced breaks at other points along the levees, and, as the evidence showed, there was a strong possibility that such a break would have occurred at a point opposite plaintiff's property because of the occurrence of previous breaks in that location. The rear part of plaintiff's property was classified as swamp and overflowed land in the original government survey of the area. It is not disputed that it would have been poor engineering practice to close the Moulton and DeJarnatt Breaks and not to provide another relief opening such as the Colusa Weir. There was evidence that, rather than diverting water onto plaintiff's land by which it would otherwise not have been reached, the construction of the Colusa Weir and the closing of the other breaks actually diminished the flow of water into the Butte Basin, limited the occasions upon which it was flooded, and raised the level at which the river would overflow. There was evidence that the construction of the Colusa Weir did not increase the frequency of inundation of plaintiff's land and that plaintiff's land was not flooded to any greater extent than it had been by water flowing through the Moulton and DeJarnatt Breaks before the weir was constructed. The jury could have inferred that the large expenditures of the state and of the federal government for greater flood protection than that afforded by the farmer levees actually benefited plaintiff as well as the other landowners, and that the damage caused by waters flowing over the Colusa Weir was less than would have been caused by

the flood waters of the river had the project not been constructed. This evidence, however, does not as a matter of law require a verdict for defendants. They did in fact cut the bank of the river from eight to ten feet below its normal elevation opposite plaintiff's land and caused the flow of water over the weir to be dumped on plaintiff's land. The water that would have flowed through the Moulton and De-Jarnatt Breaks before they were closed is flood water because it was not contained by the banks of the river. The water that was prevented from going through these breaks after they were closed remained flood water, and if it is that water that went over the Colusa Weir defendants are not liable. Thus defendants are liable only if the water flowing over the Colusa Weir is water that would have been contained by the banks of the river had the Moulton and DeJarnatt Breaks not been closed. Plaintiff's witnesses disputed the evidence of the state and asserted that water was thereby dumped on plaintiff's land to a substantially greater extent than would have been the case had it been carried out the old breaks. The jury could have inferred from this evidence that plaintiff's land was damaged by the diversion of water over the Colusa Weir whereas it would not have been so damaged by the retention of the Moulton and DeJarnatt Breaks. We cannot say that such an inference finds no support in the evidence. The resolution of the conflict must be made by the trier of fact and not by this court on appeal. (*De Baker* v. *Southern Calif. Ry Co.*, 106 Cal. 257, 285 [39 P. 610, 46 Am.St.Rep. 237] ; *Perkins* v. *Blauth*, 163 Cal. 782, 790-792 [127 P. 50].)

Since there is no question of the power of the state to construct the Colusa Weir, cases such as *Gray* v. *Reclamation Dist.*, 174 Cal. 622, 653 [163 P. 1024], in which an injunction against the construction of a flood control system was sought, are not in point. ■ The construction of the public improvement is a deliberate action of the state or its agency in furtherance of public purposes. If private property is damaged thereby the state or its agency must compensate the owner therefor (Cal. Const., art. I, § 14; *Perkins* v. *Blauth*, 163 Cal. 782, 789 [127 P. 50] ; *Kaufman* v. *Tomich*, 208 Cal. 19, 25 [280 P. 130] ), whether the damage was intentional or the result of negligence on the part of the governmental agency. (*Reardon* v. *San Francisco*, 66 Cal. 492, 505 [6 P. 317, 56 Am.

Rep. 109] ; *Mitchell* v. *City of Santa Barbara,* 48 Cal.App.2d 568, 572 [120 P.2d 131] ; *Hooker* v. *Farmers' Irr. Dist.,* 272 F. 600; see cases collected in 69 A.L.R. 1231.) The decisive consideration is whether the owner of the damaged property if uncompensated would contribute more than his proper share to the public undertaking. (*Rose* v. *State of California,* 19 Cal.2d 713, 737 [123 P.2d 505] ; *City of Stockton* v. *Vote,* 76 Cal.App. 369, 404 [244 P. 609] ; *City of Redding* v. *Diestelhorst,* 15 Cal.App.2d 184, 193 [59 P.2d 177] ; *City of Pasadena* v. *Union Trust Co.,* 138 Cal.App. 21, 25 [31 P.2d 463] ; *Temescal Water Co.* v. *Marvin,* 121 Cal.App. 512, 521 [9 P.2d 335].)

The applicability of the common enemy doctrine as a defense available to defendants on a retrial of this cause is set forth in *Archer* v. *City of Los Angeles,* 19 Cal.2d 19 [119 P.2d 1]. In that case, defendant city had constructed certain improvements to facilitate the drainage of a watershed area near Venice. Flood waters caused by an unusually heavy rainfall were drained off the lands of upper owners in the area and carried by the drainage system into a lagoon below that was inadequate to contain the greatly increased flow. As a result, the flood waters spilled over onto the lands of the plaintiffs, inundating them for several days. It was not contended that the water causing the damage was natural stream water or that it had been diverted by the drainage system out of its natural channel. The court recognized that ''If the water is diverted out of its natural channel and discharged into a different channel or upon neighboring land, the diverter is liable to the owner whose land is injured by such discharge. [Citations.] In the present case, however, there is no evidence of diversion. Straightening, widening, or deepening the channel of a stream to improve the drainage entails no diversion of the waters therein.'' (*Archer* v. *City of. Los Angeles, supra,* p. 26.) Since, in that case, the damage was caused solely by flood waters that would have inundated plaintiffs' land even though the drainage system had not been constructed, it was held that the injury was *damnum absque injuria,* and that it was not made actionable merely because the construction of the drainage system had increased the velocity of the flood waters or the extent to which they covered plaintiffs' land. By the same reasoning, plaintiff in the present case is entitled to recover for whatever damage to his land is attributable to defendants' lowering of the levee and diversion of the natural stream waters into an artificial channel, but cannot recover for any damage caused

by flood waters against which he had the duty of self-protection, even though the velocity of those waters and their carrying capacity were increased by the construction of the flood control project.

There is no merit in plaintiff's contention that the trial court erroneously instructed the jury on the allegations of the second count of his complaint, by which recovery was sought on the basis of defendants' allegedly negligent maintenance of the Colusa Weir. The transcript discloses that adequate instructions on negligence were given the jury, and that plaintiff requested no instructions thereon that were not given. The effect of the instructions was to submit properly to the jury the issue whether defendants were negligent in the maintenance of the Colusa Weir and whether plaintiff was damaged thereby. (See *House* v. *Los Angeles County Flood Control Dist.*, 25 Cal.2d 384 [153 P.2d 950].)

Defendants contend, however, that any error in the instructions was not prejudicial for the reason that the jury might have based its verdict on the absence of damage to plaintiff's land or the applicability of the statute of limitations, issues not affected by the challenged instructions. They rely on the rule that a judgment will not be reversed on appeal if there is substantial evidence to support the verdict on any theory on which it might have been reached. That rule applies to cases in which one or more of the possible theories on which a jury might have reached a verdict is not supported by substantial evidence, but other theories supported by such evidence were presented; it is then presumed that the jury reached its verdict on a theory that is supported by the evidence. The rule also applies to cases in which no other verdict is possible as a matter of law. It is not applicable, however, to a case such as this, in which the jury has been precluded by erroneous instructions from considering a valid theory upon which a result different from that actually reached might have been supported. The error in such a case is not cancelled by the fact that the jury might have found for the prevailing party on some other ground. " 'It is true that in determining whether a verdict is supported by the evidence, we must assume that the jury accepted the view most favorable to the respondent. However, in determining whether or not the instructions given are correct, we must assume that the jury might have believed the evidence upon which the [cause of action or defense of] the losing party was predicated, and

that if the correct instruction had been given upon that subject the jury might have rendered a verdict in favor of the losing party.' '' (*Oettinger* v. *Stewart*, 24 Cal.2d 133, 140 [148 P.2d 19, 156 A.L.R. 1221] ; *O'Meara* v. *Swortfiguer*, 191 Cal. 12, 15 [214 P. 975].)　■■■　Where, as here, the error consisted in instructing the jury as a matter of law on a question that is one of fact on conflicting evidence, and a determination favorable to the losing party might have been made if the error had not been committed, that error is prejudicial. (*Edwards* v. *Freeman,* 34 Cal.2d 589, 594 [212 P.2d 883] ; *Huebotter* v. *Follett,* 27 Cal.2d 765, 770-771 [167 P.2d 193].)

Neither of the alternative grounds upon which it is urged that the jury could have reached its verdict is established by the evidence as a matter of law. On both grounds, there was conflicting evidence by which either of two verdicts could be supported.

There was ample evidence to support defendants' contention that plaintiff's land was not damaged by the water. Defendants' expert witnesses testified that the deposit of soil on plaintiff's land was of a fine fertile quality, superior to that of the natural soil beneath it, but that plaintiff made no attempt to clear and cultivate the land after 1941, even though he might easily have done so. There was evidence that the swales allegedly cut on plaintiff's land were in fact cut by flood waters pouring through the breaks in the farmer levees before the construction of the Colusa Weir. There was testimony that the value of plaintiff's land had not been decreased by its inundation but that it had in fact been increased by the soil deposited thereon. We cannot say, however, that plaintiff's evidence would be insufficient to support a verdict in his favor. He testified that his land had depreciated $22,000 in value because of the inundation, and that it could not be farmed along the easterly third because of the sedimentary deposit. His testimony was corroborated by expert witnesses. Plaintiff was competent to testify to the value of his own property (*Willard* v. *Valley Gas & Fuel Co.,* 171 Cal. 9, 14-16 [151 P. 286] ), and his testimony, if believed, would support an implied finding that he suffered damage to his land by the construction of the Colusa Weir.

The defense that the statute of limitations had run on plaintiff's cause of action is not established by evidence that is without conflict. Plaintiff testified that the damage to his land first became apparent on or about June 1, 1941. He filed a claim therefor with the State Board of Control on May

7, 1942. That claim was not rejected by the board until September 22, 1944, and the complaint in this action was filed on October 16, 1944. It is clear, therefore, that if plaintiff's testimony were believed by the jury, neither the two-year limitation period prescribed by Political Code, section 688.1, nor the three-year limitation period prescribed by Code of Civil Procedure, section 338(2), had run at the time this litigation began. (*Natural Soda Products Co.* v. *City of Los Angeles,* 23 Cal.2d 193, 202 [143 P.2d 12].)

Defendants also contend that the participation in the project by the federal government relieves them from liability for damage caused thereby. They rely on *Cory* v. *City of Stockton,* 90 Cal.App. 634 [266 P. 552], and *Brandenburg* v. *Los Angeles County Flood Control Dist.,* 45 Cal.App.2d 306 [114 P.2d 14]. In the Cory case, defendant's only participation in the project was the purchase of land for a right of way. In the present case, the state paid half the construction costs, purchased lands for rights of way and flowage, and participated with the federal agencies in the planning of the project. Responsibility for its control is vested concurrently in state and federal governments. (U. S. River and Harbor Act of August 26, 1937; Water Code, § 8530.) The operation of the completed project is the sole responsibility of the state. (Water Code, § 8361 (i); 11 Ops. Atty. Gen. 93-94.) The Brandenburg case decided that plaintiff's minor son, for whose death recovery was sought, was not "property" of which there was a taking within the meaning of article I, section 14, and that the state had therefore not consented to being sued for the negligence of its agents therein. The dictum that the state was relieved from liability by the participation of the federal government in the project was unnecessary to the decision therein and is inconsistent with later cases involving the same defendant in which its liability has been recognized. (*House* v. *Los Angeles County Flood Control Dist.,* 25 Cal.2d 384, 392 [153 P.2d 950]; *Stone* v. *Los Angeles County Flood Control Dist.,* 81 Cal.App.2d 902 [185 P.2d 396]; *Weck* v. *Los Angeles County Flood Control Dist.,* 80 Cal.App.2d 182 [181 P.2d 935].)

The judgment is reversed and the cause remanded for retrial in accordance with the views expressed herein.

Gibson, C. J., Shenk, J., Edmonds, J., and Spence, J., concurred.

CARTER, J.—I concur in the judgment of reversal, but do not agree with the reasons on which it is based. The majority opinion cites and apparently relies upon, the cases of *Archer* v. *City of Los Angeles*, 19 Cal.2d 19 [119 P.2d 1], and *O'Hara* v. *Los Angeles Flood Control Dist.*, 19 Cal.2d 61 [119 P.2d 23]. These cases are in direct conflict with the basic theory upon which the majority opinion in this case is based. I dissented in both of the last mentioned cases and the views expressed in those dissents constitute the only basis upon which plaintiff may prevail in the case at bar. What the defendants did in the Archer and O'Hara cases is the same as what the defendants did in the case at bar, namely, they constructed a flood control system which was inadequate to protect plaintiff's property from damage by flood waters which would not have caused such damage had the system not been constructed. In those cases, the majority of this court held that defendants were not liable for the damage thus caused to plaintiff's property. In the case at bar the majority opinion holds that if plaintiff's property was damaged as the result of the changes made by defendants in the flood control system in the vicinity of plaintiff's property, he may recover. It should be clear to anyone that the basic legal theory of the Archer and O'Hara cases is diametrically opposed to the theory upon which the majority opinion in the case at bar is based. Yet the former cases are relied upon as authority for the conclusion reached in the case at bar. I commend the majority, and particularly the author of the present opinion, for their and his change of view, but I feel constrained to suggest that much confusion would be avoided in the law in this field if the Archer and O'Hara cases were overruled and a forthright declaration made by this court to the effect that defendant's liability in cases such as this is predicated upon section 14 of article I of the Constitution of California and that the police power doctrine cannot be invoked to deny compensation or damages to owners of property which has been destroyed or damaged as the result of the construction or operation of flood control projects. The Archer and O'Hara cases deny recovery upon the theory that the damages suffered were *damnum absque injuria* in that they resulted from the construction and operation of a flood control project by a public agency in the exercise of the police power. The present case holds that plaintiff may recover under section 14 of article I of the Constitution of California for any damages suffered as the result of the natural flow of the waters of the Sacramento

River discharging onto his property by reason of the changed conditions in the levees along the river brought about by the flood control project constructed by defendants. The two theories are inconsistent and no amount of distinguishing can reconcile them.

I agree with the holding in the majority opinion that " . . . the construction of the farmer levees in 1870 and their continued maintenance until 1932 created a new natural condition, in effect making the channel between the farmer levees a new natural channel and the waters contained by those levees the natural stream waters of the Sacramento River." But, I do not agree that under the so-called common enemy doctrine defendants are not liable for damage to plaintiff's land from flood waters which were caused to flow with destructive force upon plaintiff's land as the result of the lowering of the levee in the construction of the Colusa Weir, which admittedly lowered the east bank of the river to a depth of between 8 and 10 feet opposite plaintiff's land, without providing adequate safeguards against flood waters discharging through this weir with destructive force upon plaintiff's land. While this court has held in many cases that an owner of property has the right to protect his property against so-called flood waters by the construction of levees, dams, etc., on his property and that other property owners have no right of action for damages against him because such levees or dams cause the flood waters to discharge onto their property with destructive force, this does not mean, and no case except the Archer and O'Hara cases has ever held, that an owner of property may not complain and recover damages for injury to his property as a result of the construction of a flood control project where protective barriers are deliberately removed and flood waters are deliberately collected and discharged onto his property with such destructive force as to damage or destroy the same. The very fact that a project is undertaken by a public agency for the purpose of controlling flood waters should afford a sound basis for the contention that such a project when completed should protect property adjacent thereto from damage by flood waters regardless of their volume or velocity. To say that the comomn enemy doctrine should apply to a public agency charged with the duty and responsibility of constructing and maintaining a flood control project the same as to a private individual owning land adjacent to a stream, is to my mind, unsound, if not absurd.

Yet, the majority opinion states: "Action that may be taken for his own protection without liability by an individual landowner may be taken by the state for the protection of all the landowners in an area without liability under article I, section 14 for damage caused thereby." The opinion then cites and quotes from the Archer case as authority for this statement. As heretofore stated, a complete answer to this statement is found in my dissenting opinion in the Archer case.

It is apparent that the majority opinion limits the right of a private owner of land to recover damages in a case such as this, to such damages as may be caused from a diversion of natural stream waters onto his land. In this respect the majority opinion states: "If, however, the construction of a flood control project diverts natural stream waters onto the land of a private owner and causes damage thereto, that property is as much taken or damaged for a public use for which compensation must be paid as if it were condemned for the construction of a highway or a school." The majority opinion does not define what constitutes "natural stream waters." Such waters have, however, been defined by this court in *Herminghaus* v. *Southern California Edison Co.*, 200 Cal. 81 at pages 90 and 91 [252 P. 607], as being the usual and ordinary flow of the stream through the various seasons of the year, and *"that annually recurring floods, even though the flow of their waters made the stream wider during the period thereof so as to include adjoining lands, are yet to be deemed a part of the ordinary flow of the stream."* While the discussion in the Herminghaus case related to the right of a riparian owner to have the full natural flow of a stream to flow past his land, it correctly defines what constitutes the usual and ordinary flow of a stream in its relation to the common enemy or extraordinary flood waters doctrine. In other words, what constitutes the usual and ordinary flow of the Sacramento River are the waters which customarily flow in said river throughout the various seasons of the year, the fall, winter, and spring flows being greatly in excess of the summertime flow. It is a matter of common knowledge, and one of which we can take judicial notice, that at various times in the past, flows which greatly exceeded the usual and ordinary flow during the fall, winter, and spring seasons have occurred, some of them amounting to what may be termed floods which caused great damage to lands, improvements, and livestock adjacent to the lower reaches of the Sacramento River. It was to prevent the damage caused by these recurring floods that the various flood control projects

were undertaken and prosecuted to completion. If the project here involved was so constructed that the property of plaintiff and other property owners would suffer greater damage from these recurring floods than they would have suffered before the project was constructed, such landowners should be entitled to the damages suffered, and the so-called common enemy doctrine should not be invoked by the Reclamation Board or other public agency responsible for the inadequacy of the project to accomplish the objective of the flood control project.

I am unable to follow the reasoning in the following excerpts from the majority opinion: ''The construction of the Colusa Weir was not an independent project by which a continuous flood control barrier was cut. The construction of the weir was coincident with the closing of the Moulton and DeJarnatt Breaks to provide a relief opening for the protection of the levees. Damage caused thereby is therefore not actionable unless the cutting of the weir caused more water to flow into the Butte Basin than would have flowed through the Moulton and DeJarnatt Breaks before they were closed.'' . . .

''The water that would have flowed through the Moulton and De Jarnatt Breaks before they were closed is flood water because it was not contained by the banks of the river. The water that was prevented from going through these breaks after they were closed remained flood water, and if it is that water that went over the Colusa Weir defendants are not liable. Thus defendants are liable only if the water flowing over the Colusa Weir is water that would have been contained by the banks of the river had the Moulton and DeJarnatt Breaks not been closed.''

As I interpret the foregoing excerpts from the majority opinion, the thought intended to be expressed is that although plaintiff had suffered no damage from flood waters which were discharged through the Moulton and DeJarnatt Breaks, and would not have suffered any damage from the flood here in question had said breaks been left open, and that the damage to his property was caused by the closing of the breaks and the construction of the Colusa Weir, yet he may not now recover for any damage to his land if the waters causing said damage were flood waters which would have discharged through the Moulton and DeJarnatt Breaks, but which were forced through the Colusa Weir because said breaks were closed. To my mind this is a strange and unsound rule of law. In effect, it places in the hands of a public agency charged

with the duty and responsibility of constructing and maintaining flood control projects, the power to so construct and operate such projects as to damage or destroy such private property as such agency may see fit, without being liable to the owner of such private property for the loss suffered by him. If there is any basis in reason, logic, common sense, or law for such a holding it has not been advanced in a majority opinion, and I have never read a decision of any court announcing such a rule, except the Archer and O'Hara cases.

The majority opinion attempts to distinguish this case from the Archer case by the following statement: ''Since, in that case (Archer), the damage was caused solely by flood waters that would have inundated plaintiffs' land even though the drainage system had not been constructed, it was held that the injury was *damnum absque injuria,* and that it was not made actionable merely because the construction of the drainage system had increased the velocity of the flood waters or the extent to which they covered plaintiffs' land. By the same reasoning, plaintiff in the present case is entitled to recover for whatever damage to his land is attributable to defendants' lowering of the levee and diversion of the natural stream waters into an artificial channel, but cannot recover for any damage caused by flood waters against which he had the duty of self-protection, even though the velocity of those waters and their carrying capacity was increased by the construction of the flood control project.'' The purported distinction between this case and the Archer case attempted in the foregoing excerpt is not borne out by the record in the Archer case. This is shown by the following excerpt from my dissenting opinion in that case: (*Archer* v. *City of Los Angeles,* 19 Cal.2d 35 [119 P.2d 1]) ''It is manifest that the foregoing facts are sufficient to make a *prima facie* case in accordance with plaintiffs' allegations and to establish what the District Court of Appeal declared to be the gist of the Archer action, that is, that 'The gist of [the] . . . complaint . . . is that respondent constructed and built an artificial drainage system so defectively, carelessly and negligently that it would not carry the storm waters to the Pacific Ocean as designed and intended' and 'that the injury occurred by reason of the fact that respondent negligently turned the storm waters into La Ballona Lagoon, which was too small to conduct the water turned into it by and through the drainage system constructed, operated and maintained by respondent . . .' (*Archer* v. *City of Los Angeles, supra*) On the doctrine of the law of the

case, as to the Archer case, and *stare decisis,* as to the Allison case, it must be held that plaintiffs have established the liability of defendants.

"The attempted answer to that incontrovertible proposition advanced by the majority opinion is that: 'According to the allegations of the complaint, the damagé resulted because defendants negligently diverted water out of its natural channel, and obstructed the channel of the creek. Plaintiffs evidence, however, fails to substantiate such allegations.' That statement is palpably incorrect. The gist of the action as stated by the District Court of Appeal was not that water had been 'diverted out of its natural channel,' rather it was that the defendants negligently 'turned the storm waters into La Ballona Lagoon,' that is, collected surface waters and discharged them into the lagoon. The evidence without contradiction shows that that occurred. The storm waters were collected into drains and turned into the lagoon and creek, the outlet of which was too small to carry them, with the result that plaintiffs' lands were flooded when the lagoon overflowed. The prior decision is therefore the law of the case and controlling here." Also, the following excerpt from that opinion which appears on page 60: "Summing up, we have cases where public agencies, with no proprietary right so to do, have collected surface waters by the installation of drains, have discharged those waters into a natural watercourse, and have failed to provide adequate means of escape for those waters into the ocean, well knowing that their conduct would cause the flooding of plaintiffs' premises. As a result of that conduct, the waters discharged in the watercourse exceeded its capacity and could not escape through the inadequate outlet, and plaintiffs' land and the improvements thereon, not riparian to the stream, being three miles away, and not having theretofore been subject to overflow by any of the waters, are flooded and damaged. The majority decision is contrary to the firmly established law in California and the weight of authority in other jurisdictions. It will not only result in a grievous miscarriage of justice in the cases now under consideration, but will cause great confusion in the law on the subject here involved."

In the last quoted excerpt from the majority opinion in the case at bar, the statement is made that plaintiff ". . . cannot recover for any damage caused by flood waters against which he had the duty of self-protection, even though the veloc-

ity of those waters and their carrying capacity was increased by the construction of the flood control project." It is difficult for me to understand how anyone could have the temerity to even suggest that a person situated as plaintiff in this case could protect himself against flood waters of the destructive volume which was debouched on his land as the result of the operation of the flood control project here involved. Such suggestion transcends the height of absurdity and cannot be said to have for its foundation a shred of reason, logic, or common sense.

While it is probable that the advent of the great Central Valley project, which envisions the construction of numerous dams to impound the flood waters of the great Sacramento and San Joaquin Rivers at or near their sources so as to prevent the recurrence of the great floods which have in the past at various times inundated the valleys through which these rivers flow with consequent damage and destruction of property, may relieve posterity from the arduous burden of attempting to bring lucidity and order out of the confusion and chaos which now exists in the decisions of this court involving the control and use of water, I have grave doubt that any student of water law, should he so desire, will be able to reconcile the decisions of this court with any pattern which may be said to reflect judicial erudition or craftsmanship in the development of this body of our law.

SCHAUER, J.—I concur in the judgment and in the discussion by Mr. Justice Traynor except insofar as such discussion appears to support the police power-*damnum absque injuria* doctrine enunciated in *Archer* v. *City of Los Angeles* (1941), 19 Cal.2d 19 [119 P.2d 1], and in *O'Hara* v. *Los Angeles County Flood Control Dist.* (1941), 19 Cal.2d 61 [119 P.2d 23]. I would prefer, with Mr. Justice Carter, to overrule the holdings of the Archer and O'Hara cases in respect to the mentioned doctrine.

Respondents' petition for a rehearing was denied August 31, 1950.