[Civ. No. 15092. First Dist., Div. Two. Feb. 4, 1953.]

EMMA PETERSEN, Appellant, v. CARL H. RIESCHEL, Respondent.

Delany, Werchick, Fishgold & Minudri, Jack H. Werchick and Franklyn K. Brann for Appellant.

Belcher & Koller, Clark & Heafey and Gerald P. Martin for Respondent.

GOODELL, Acting P. J.—This appeal is from a judgment entered on a verdict for defendant in a personal injury action. A new trial was denied.

At about 6:30 a.m. on January 13, 1950, appellant, a widow, was struck and severely injured by an automobile driven by respondent. She had walked, on her way to work, from her home on Kansas Street in San Francisco to Potrero Avenue and 22d Street, and was struck while approaching a northbound Potrero Avenue streetcar, intending to board it.

Potrero Avenue runs approximately northerly and southerly and 22d Street approximately easterly and westerly. There is a safety zone 55 feet long and 3 feet wide at the intersection, delineated by a white stripe painted on the pavement with three metal buttons at its north end and four at its south end. The distance from the easterly edge of the white stripe

to the easterly curb of Potrero Avenue is 27 feet 3½ inches, divided by painted lines into three lanes. It was dark and the streets were dry.

At the intersection there is an electric signal with red, yellow and green lights to control traffic, and from the time the streetcar and respondent's automobile approached the zone until after the impact the green light giving clearance to northbound traffic was on and the red light holding up east-west traffic was on.

At the time of the accident a northbound streetcar was practically stopped, with its front end at or approaching the north end of the zone (and the south line of the southerly east-west crosswalk).

Just before the accident respondent was driving his 1939 Plymouth, with headlights on, in the middle northbound lane and in the general flow of traffic. He testified that he saw a streetcar ahead of him slowing down as he neared the zone and continued on, with the green light, at about 20 miles an hour.

Appellant, who had been standing on the easterly curb of Potrero, at a point somewhere between 25 and 50 feet south of the south line of the crosswalk, waited for northbound traffic, including a truck, to pass, and then started across the traffic lanes at an angle southerly, headed for the rear end of the streetcar.

The conductor of the car, a witness for plaintiff, testified on cross-examination that she was "hasting" and "rushing," also that "she hurried right around the back of the truck toward the street car." A passenger on the car, a witness for defendant, testified on direct examination that "she dashed across the street" and "she made a run across the street." The same witness recalled that he had seen her "stepping off and on the curb a couple of times."

When the front of respondent's automobile was about 10 feet north of the rear end of the streetcar he saw appellant in the middle of his lane and about 5 feet directly in front of his car. He immediately applied his brakes and swerved to his right, but struck her with his left front bumper and fender. The impact threw her into the safety zone about opposite the front steps of the streetcar. He came to a stop within 5 or 6 feet. In swerving, the right front end of his car crossed the white line to his right, and his car was pointing in a general northeasterly direction partly in the lane to his right when it came to rest.

Appellant's first contention is that the court erred in commenting on the physical condition of defendant in such a manner as to support his credibility.

The trial opened on a Friday and the jury was empanelled and sworn that morning and a recess was taken until 2 o'clock, at which time 11 jurors were present. While waiting for the absentee the court said: "I was going to announce before this happened, they have sickness in the home of one of the parties to the case that forces us to continue the trial until Monday. I was advised that the gentleman was sick and would not be able to continue here this afternoon." While still waiting, this occurred: "The Court: How is your man? Are you going to bring him to the hospital? Mr. Heafey: I think when his nerves calm down he will feel a little bit better. The Court: What has he got, the 'flu'? Mr. Heafey: No. I don't know, it is just like shell shock. A combination, I guess, of stomach and nerves. The Court: Well, there is no need of us waiting. We are going to recess anyway." Counsel then stipulated to an adjournment and the court said: "Ladies and gentlemen, you will now be excused then until Monday morning at 10:00 o'clock, due to the fact the defendant became sick . . ."

A few minutes later the tardy juror came in and the following ensued: "The Court: What happened to you? Mrs. Grey: There was a fire in the building. I didn't know whether to come in or not. The Court: Somebody set fire to the dome . . . One of the parties got sick . . . And in fact he is in my chambers on the couch now. And I had known he was sick. Mr. Heafey told me before noon. Mr. Werchick had planned to proceed in his case in a certain way, and by reason of that it interfered with his proceeding. So as a result we recessed until 10:00 o'clock Monday morning . . ." The other 11 had left, hence only this juror heard this last statement.

It appears from the affidavit of appellant's counsel on motion for new trial: "That, at the opening of the trial . . . defendant, in the presence of the jury, broke down and was removed from the court room . . ." There is nothing in the record to show how his breakdown was manifested or how much attention, if any, it attracted.

The trial went forward the following Monday and toward noon, during a discussion concerning the trial's progress the court said to appellant's counsel in the presence of the jury "It is not your fault, I will say, that you had planned to use the defendant, and the defendant has become so ill, according to his statement and the doctor's statement at least,

he will be unable to be present.'' This had reference to a letter from respondent's doctor to the judge stating that in his opinion ''further court appearances will worsen his condition,'' but it was not read to the jury.

On the second day of the trial proper, the court made the following statement in the presence of the jury:

''. . . The Court has before it a doctor's certificate . . . There is no use making anything out of it. The man is sick, apparently, and that's that . . .'' Thereupon defendant's deposition, taken some months before under section 2055, was read into evidence.

■ Appellant argues ''that the combination of defendant's 'collapse' and the Court's comments, in the presence of the jury, tended to impress the jury with sympathy for defendant and to indicate that the Court believed that defendant was ill and unable to be present at trial. In effect, it was a comment on the credibility of the defendant which, very likely, could and did affect the jury when it considered the testimony of defendant (given by deposition).'' We agree that the judge indicated that he ''believed that . defendant was ill and unable to be present at trial'' since his language ''and that's that'' showed that he accepted at full face value the doctor's certificate which stated *inter alia* that defendant had been under his care ''for several months for a nervous breakdown.'' The court had to pass upon the question whether defendant was well enough to attend court, and the jury, in fairness to everyone concerned, was entitled to know why he, a litigant, was not present.

It is not unusual for witnesses, jurors, litigants or attorneys to be taken sick during a trial. Indeed, one of plaintiff's witnesses had the ''flu'' and defendant's counsel expressed apprehension lest he ''get it'' from the witness. And still another witness (for defendant) was unable to attend court because of illness, and his deposition was taken at his home during the trial and read to the jury. At one point during the trial counsel for plaintiff in examining his sick witness said: ''Well, we are concerned with your health now . . . everybody seems to be sick in this case . . .'' And the witness said: ''I got out of bed to come down here.''

In the court's inquiry: ''How is your man? Are you going to bring him to the hospital?'' there was nothing beyond the expression of a natural and humane interest in the condition of a person apparently ill. Such solicitude in these circumstances (which we have related in considerable detail) could

hardly have been interpreted by the jurors as "a comment on the credibility of the defendant" when it came to a consideration of his testimony. Counsel's reply "stomach and nerves" did not exaggerate or magnify his client's condition, and appellant does not so argue. The court's explanation of the continuance, to the tardy juror, was harmless and simply told her something she was as much entitled to know as were the other 11.

Appellant cites *McMinn* v. *Whelan*, 27 Cal. 300; *People* v. *MacDonald*, 167 Cal. 545, 550 [140 P. 256]; *Berguin* v. *Pacific Elec. Ry. Co.*, 203 Cal. 116, 121 [263 P. 220] and *Anderson* v. *Mothershead*, 19 Cal.App.2d 97, 101 [64 P.2d 995].

In *McMinn* v. *Whelan* the court (p. 319) speaks of the authoritative position of a trial judge and the influence of his comments on the jury, which of course cannot be gainsaid. There the judge in ruling remarked that plaintiff's witness was one of the most respectable women in his neighborhood —a woman of respectability. While this irregularity was disapproved, the judgment was not reversed.

In *Anderson* v. *Mothershead*, the language of the McMinn case is quoted in connection with "the court's remarks which tended to discredit defendant's counsel with the jury" and which also indicated that he looked with disfavor on defendant's testimony respecting the circumstances of the accident. The judgment had to be reversed, however, primarily for prejuidical error in an instruction on speed which shifted the burden of proof onto the defendant. (See *Akers* v. *Cowan*, 26 Cal. App.2d 694, 697-698 [80 P.2d 143] and *Westberg* v. *Willde*, 14 Cal.2d 360, 369-370 [94 P.2d 590].) The court in another instruction used the words "a terrible and a sad thing" in connection with the plaintiff's injuries, which was held improper.

In *People* v. *MacDonald*, the judge commented that the prosecutrix in a rape case was "courteous, kind and modest." He was criticized for this but the judgment of conviction was not disturbed.

The trial judge's remarks in the Berguin case (found at 203 Cal. 118-119) speak for themselves. At page 120 the Supreme Court said that the judge "doubtless regretted the hasty act on his part but the jury were not adequately or at all apprised of this fact. In fact, throughout the trial plaintiffs' counsel were repeatedly subjected to the severest strictures by the court, many of which seem unwarranted."

None of these cases has any similarity to the case at bar. Moreover, the usual instruction was given which cautioned the jury to disregard any of the court's statements which might seem to indicate an expression of opinion respecting credibility. (See *Loper* v. *Morrison*, 23 Cal.2d 600, 610 [145 P.2d 1].) Finally, appellant's counsel at no time made any assignment of error or misconduct.

Appellant's second contention is that the court erred in instructing the jury that the violation of section 510 Vehicle Code did not constitute negligence *per se.*

The court gave a group of nine instructions based on the vehicle code, in the following order: sections 510, 81, 571, 86, 85, 475, 476, 83, 88. The instruction on section 510 reads:

"Now . . . The basic speed law . . . as provided by Section 510 of the Motor Vehicle Code, is as follows: 'No person shall drive a vehicle upon a highway at a speed greater than is reasonable or prudent, having due regard for the traffic on, and the surface and width of, the highway, and in no event at a speed which endangers the safety of persons or property.' And a violation of this basic rule is negligence."

After the nine instructions were read the court instructed as follows: "Now, conduct which is in violation of those sections . . . with the exception of section 510, constitute negligence per se. This means that if the evidence supports a finding, and you do find, that a person did so conduct himself, it requires a presumption that he or she was negligent. However, such presumption is not conclusive. It may be overcome by other evidence showing that under all the circumstances surrounding the event, the conduct in question was excusable, justifiable and such as might reasonably have been expected from a person of ordinary prudence. In this connection, you may assume that a person of ordinary prudence will reasonably endeavor to obey the law and will do so unless causes, not of his own intended making, induce him, without moral fault, to do otherwise."

Appellant argues that such a statement "following the reading of eight different sections of the Vehicle Code . . . could only confuse the jury and raise doubt in their minds as to which one was '510' and which one was excepted from the rule that would make its violator negligent per se. Also included in the list of Vehicle Code sections were the instructions on the duty of defendant under 571(b). Unless the jury kept in mind the numbers of the sections as read by the judge, is it unlikely to suppose that at least one juror felt that viola-

tion by defendant of 571(b) (admitted by his own testimony) would be the exception referred to by the judge."

That argument asks us to assume that the jury did not keep "in mind the numbers of the sections as read by the judge" and also to speculate, whether at least one juror might not have confused the general and simple terms of section 510 with the specific terms of section 571(b). There is no reason why we should do either. Although nine sections were read in sequence they presented no baffling or complicated problem since five of them dealt merely with definitions, i.e., section 81, streets and highways; section 83, roadway; section 85, crosswalk; section 86, intersection; section 88, safety zone. This left but three dealing with substantive rules, namely, section 475, "Obedience to official traffic signals", section 476, "Official traffic signals", and section 571, "Overtaking and passing standing street car" in addition to section 510.

██ It would seem improbable that the jury with section 571(b) before it, dealing with the specific subject of a 10-mile limit while passing a standing streetcar, should confuse such instruction with one which specified no speed whatever in miles-per-hour. Appellant's argument is not convincing on this point.

It is true the court first instructed that "a violation of this basic rule" (§ 510) is negligence, and later on said that conduct in violation of those (nine) sections (which, as already appears, included five mere definitions) *with the exception of section 510* constituted negligence *per se.* Such conflicting instructions were erroneous but the error in our opinion was not prejudicial. As already indicated, a violation of the basic speed law could not have been by any means a turning point in this case since section 571(b) dealt with a specific, 10-miles-per-hour limit at the point of impact and obviously it was upon section 571(b), and not section 510, that appellant relied.

██ Appellant's third point is that the court erred in giving contradictory and inconsistent instructions on material points.

The court read to the jury, section 571, Vehicle Code, including the following: "(b) Where a safety zone has been established or at an intersection where traffic is controlled by an officer or a traffic control signal device, a vehicle need not be brought to a stop before passing any such . . . street car but may proceed past such car at a speed not greater than ten

miles per hour and with due caution for the safety of pedestrians.''

Appellant claimed that respondent violated that section by driving in excess of 10 miles an hour while beside the zone, and that such conduct was negligence *per se*. Her case was based largely on that theory.

The court also read to the jury section 476, Vehicle Code, including the following: ''(c) . . . 3. No pedestrian shall enter the roadway or cross any part of the roadway or from or to a safety zone against a red or 'Stop' signal . . .''

The jury was instructed as to each section that its violation was negligence *per se*.

Respondent claimed that appellant violated that provision and that her conduct was negligence *per se* which constituted contributory negligence.

■ ''A litigant requesting it is entitled to proper instructions presenting his theory of the case, based upon the pleadings and proofs. And if the parties to an action rely upon different theories, instructions should be given, when requested, as to each . . .'' (24 Cal.Jur., p. 826, § 92). The court apparently obeyed this settled rule, as it was bound to do regardless of consequences.

This court had a somewhat similar situation before it in *Murero* v. *Reinhart Lbr. Co.*, 85 Cal.App. 385, 387 [259 P. 494], where the instruction in question was based on section 134 of the old Motor Vehicle Act dealing with a 10-mile limit while beside a streetcar while passengers were boarding or alighting. We said: ''Just as it was the duty of the trial court to instruct the jury giving all proper instructions supporting the theory of the plaintiff, it was equally the duty of the trial court to give to the jury all proper instructions supporting the theory of the defendants.''

In *Brown* v. *Yocum*, 113 Cal.App. 621, 622, 623 [298 P. 845], it was said: ''It is an elemental rule that the court may instruct the jury upon all issues pleaded or otherwise established by the evidence. Inconsistent causes of action or defenses may be alleged and set up, and instructions covering them must necessarily be based upon conflicting and contradictory hypotheses.''

The same was said in *Baugh* v. *Beatty*, 91 Cal.App.2d 786, 791 [205 P.2d 671]. In *Matsumoto* v. *Renner*, 90 Cal.App.2d 406, 410 [202 P.2d 1051], the court said: ''Negligence and contributory negligence were issues raised by the pleadings and defendants were entitled to have the jury instructed as to

their theory of the case. [Citations.]'' So here, the instruction under section 571 was based on plaintiff's theory of defendant's negligence, while that under section 476 was based on defend-. ant's theory of plaintiff's contributory negligence. See, also, *Raymond* v. *Hill,* 168 Cal. 473, 479 [143 P. 743]; *Burge* v. *Albany Nurseries, Inc.,* 176 Cal. 313, 319 [168 P. 343]; *Bickford* v. *Pacific Elec. Ry. Co.,* 120 Cal.App. 542, 549 [8 P.2d 186], and *Buckley* v. *Shell Chemical Co.,* 32 Cal.App.2d 209, 216 [89 P.2d 453].

 It is to be ''presumed that the jury reached its verdict on a theory that is supported by the evidence'' (*Clement* v. *State Reclamation Board,* 35 Cal.2d 628, 643 [220 P.2d 897]). There is ample evidence to support a finding of appellant's contributory negligence based on her violation of section 476. If so, it cannot be said that there was any inconsistency in the instructions since the jury with perfect consistency could have found the defendant negligent based on his violation of section 571 and at the same time found the plaintiff contributorily negligent based on her violation of section 476.

Appellant in arguing that there was no basis for the instruction under section 476 relies on the case of *Croxall* v. *Broadway Department Store, Inc.,* 127 Cal.App. 153, 156 [15 P.2d 546], which held that a pedestrian going from a safety zone to the curb did not come within the strict letter of a city ordinance relating to pedestrians crossing the roadway from curb to curb. However, that case was decided in 1932 while the provision of section 476 quoted above was added in 1945. Conceivably it might have been added because of that decision and to clarify and settle for the future the problem which it presented.

 Appellant's fourth point is that the court erred in refusing the following instruction: ''You are instructed that a pedestrian going from the curb to a streetcar safety zone is not required by law to approach the safety zone by way of the cross walk, but may go from the curb to the streetcar safety zone using ordinary care for her own safety.'' The record shows that it was based on the Croxall case, discussed under the preceding heading. The 1945 amendment of section 476, which covered with precision the subject of pedestrians stepping into the roadway *at any part* thereof, or *going to or from a safety zone, against a stop signal,* was the last word on the subject and that provision of course precluded the giving of any such instruction as that tendered.

In respondent's brief the points and authorities just discussed under appellant's third and fourth headings were fully developed and argued. Appellant has not seen fit to file any closing brief, and such failure leaves this court without the benefit of any answers which appellant might have been able to suggest.

 Appellant's fifth point is that it was error to instruct in the usual form on imminent peril.

No objection is made to the form or language of the instruction but the complaint is that none at all should have been given on that subject.

It is apparent that the theory on which it was given was the emergency which presented itself when respondent discovered appellant as close as 5 feet in front of his automobile. The testimony that appellant was "hasting" and "rushing"; that "she hurried right around the back of the truck toward the streetcar"; that "she dashed across the street"; that "she made a run across the street," all shows sudden action on her part. Respondent testified that he swerved to the right in trying to avoid hitting her and that in doing so he got 5 or 6 feet into the right-hand lane. He was cross-examined closely and incisively in an attempt to force an admission that he did not see appellant until he hit her, hence that he did nothing at all after seeing her. Certainly respondent's testimony on direct and cross-examination and all the other evidence in the case justified respondent in urging, and the court in giving, an instruction on imminent peril; there was substantial evidence to support it (24 Cal.Jur. p. 826, *supra*).

A further reason why the imminent peril instruction could not have been error is that it was impersonal and bilateral. Appellant found herself confronted with a sudden peril at the same time respondent was so confronted. Four times in the course of the instruction the court used both the masculine and feminine genders.

We find no merit in any of appellant's contentions.

The judgment is affirmed.

Dooling, J., and Jones, J. pro tem., concurred.

A petition for a rehearing was denied March 6, 1953.