Filed 3/14/14  Ammari Electronics v. Pacific Bell Directory CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| AMMARI ELECTRONICS et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> PACIFIC BELL DIRECTORY, <br><br> Defendant and Appellant. | A136801 <br><br> (Alameda County <br> Super. Ct. No. RG05198014) |

Pacific Bell Directory (Pacific Bell) appeals from a class action judgment awarding over $17 million in breach of contract damages to tens of thousands of advertisers in its Yellow Pages directories (directories).  The judgment is premised on Pacific Bell's asserted failure to exert its best efforts in distributing the directories to its business and residential customers in all parts of the state.  Pacific Bell challenges (1) the trial court's rulings certifying this case as a class action, (2) the sufficiency of the breach of contract evidence, and (3) the amount of damages awarded.  We affirm the judgment.

## I.  FACTUAL AND PROCEDURAL BACKGROUND[1]

Named plaintiffs[2] and the approximately 380,000 class members they represent (collectively plaintiffs) entered into standardized contracts with defendant Pacific Bell to

---

[1] This section is adapted in part from the nonpublished decision by a different panel of this court in *Ammari Electronics v. Pacific Bell Directory* (Nov. 15, 2011, A126326) (*Ammari I*).

[2] Named plaintiffs are Ammari Electronics; Mehdi Ammari; Framer's Workshop; Koszdin, Fields, Sherry & Katz, a Law Partnership; and Law Offices of William J. Kropach.

have their advertisements put into its directories, and to have the directories distributed free of charge to potential customers in each plaintiff's geographic distribution area. Plaintiffs contracted with Pacific Bell to advertise in at least one of the geographically distinct directory districts throughout California.[3] Some of the plaintiffs advertised in more than one directory. Plaintiffs alleged that between February 2002 and May 2004, Pacific Bell breached those contracts by failing to deliver a substantial quantity of the directories containing plaintiffs' advertisements to potential customers as agreed.

Over Pacific Bell's objection, this lawsuit was certified as a class action on behalf of "[a]ll individuals and businesses who had written contracts with Pacific Bell Directory to purchase advertisements in the SBC yellow pages directories that were published and were supposed to be distributed in California . . . at any time between February 1, 2002 and May 30, 2004." It was alleged that during the 29-month class period, plaintiffs and over 350,000 other California businesses purchased more than $2 billion dollars worth of advertising from Pacific Bell. The trial commenced on May 12, 2009, and was conducted in two phases. The court first held a bench trial before a jury was empanelled to interpret the contract, and to determine the contractual standard by which Pacific Bell's delivery performance should be measured. In a written decision, the court held "the rules of contract interpretation and the extrinsic evidence support the 'best efforts/good faith/due diligence' obligation and do not support an obligation to achieve a quantitative result . . . ."

The case then proceeded to a five-week jury trial. Every facet of Pacific Bell's complex system for delivering directories was described for the jury. Briefly summarized, in order to deliver approximately 30 million directories every year to a vast variety of locations in California, Pacific Bell uses third party distribution vendors. During the class period, Pacific Bell contracted with two such vendors—Product Development Corporation (PDC) and ClientLogic. ClientLogic, in turn, subcontracted

---

[3] We use the term "directory district" to refer to a telephone directory identified by geographic area and issue date, e.g., the 2002 Sacramento directory.

with Turtle Ridge Media Group to perform the hand distribution of California directories. Pacific Bell stipulated that it was legally responsible for the delivery performance of its third party distribution vendors.

Each time Pacific Bell published a new edition of a directory in a particular area, which was usually every 12 months, it contractually required its third party distribution vendor to hand-deliver a copy of the new directory to all business and residential telephone customers in the directory district. This is known as the "primary delivery" or "initial distribution," and usually takes from 7 to 30 days to complete. After the initial distribution, there is a "secondary distribution," which is used to distribute directories to "new connects" (telephone customers who move to the directory area after initial distribution), telephone booths, access stands (locations where directories are made available to the public for pickup), and to people or businesses who call to request directories during the year. It was estimated that approximately 20 percent of the directories are delivered during secondary distribution.

Throughout the relevant time period, Pacific Bell paid Certified Audit of Circulations (CAC), a third party nonprofit auditor, to conduct delivery verification surveys to gauge the success of the distribution for each directory published and distributed in California. CAC performed surveys not only for Pacific Bell, but also for other phone book companies, newspapers, and advertisers. CAC performed each survey after notification that the initial delivery had been completed. The same audit methodology was used throughout California. After the third party distribution vendor completed the initial delivery, CAC telephoned a random sample of residences and businesses within the directory area. Among other things, the survey respondents were asked whether or not they received a directory. CAC expressed the survey results as a percentage of businesses and residences who received directories in each directory district. CAC ensured that the number of calls provided statistically significant audit results with a 2 to 3 percent margin of error. Plaintiffs' statistical and survey expert, Michael Sullivan, Ph.D., confirmed that CAC's methodology conformed to generally

accepted survey practice, and that the CAC scores were valid and reliable measures of the percentage of directories that were actually delivered in each directory district.

There was overwhelming evidence that Pacific Bell relied on these CAC delivery verification surveys for various purposes, including to measure the effectiveness of its third party distribution vendor's performance. Many documents showed that Pacific Bell required its distribution vendor to ensure that at least 96 percent of the telephone customers in each directory district receive a directory as measured by the CAC scores.

There was evidence of ongoing, severe problems in delivering directories, including many documented, out-of-court admissions by Pacific Bell's own distribution managers acknowledging delivery failures. Illustrative examples include written acknowledgement that Pacific Bell's third party distribution vendor "fail[ed] to perform at the basic competency level" and that emergency procedures needed to be implemented. There was evidence Pacific Bell terminated PDC after criticizing its delivery effort during the first half of the class period. Likewise, Pacific Bell terminated the replacement distributor, ClientLogic, for "failure to perform" one year into a three-year distribution contract, after repeated criticism of its delivery performance. Plaintiffs argued that despite knowledge of delivery failures, Pacific Bell continued to bill plaintiffs in full for advertising charges, with the exception that the few advertisers who became aware of delivery failures and complained about them were given a partial refund of their advertising charges.

To obtain class certification, plaintiffs agreed to forego damages based on the specific impact on particular plaintiffs—such as lost profits—acknowledging that this measure of damages would be difficult to prove or measure on a classwide basis. Instead, the class sought damages in the form of a refund for a portion of their advertising charges. The refund amount was calculated based on the difference between the percentage of residences and businesses that should have received timely delivery of directories but did not, and the percentage of residences and businesses that actually received timely delivery of directories. Under plaintiffs' damages model, all class members advertising in a specific directory would receive a fixed refund of a percentage

4

of the total advertising charges paid to Pacific Bell for that directory in proportion to the delivery shortfall. The net amounts plaintiffs paid to Pacific Bell in advertising fees for each directory district was established by stipulation of the parties. The trial court articulated the damage formula as follows: "[A]ssuming liability, the jury will determine what level of distribution [Pacific Bell] would have achieved if it had used its 'best efforts and due diligence' and then determine the pro rata rebate [of net advertising fees paid], if any, based on that figure."

During the relevant timeframe, Pacific Bell distributed 163 different directories, specific to each year and in each directory area. This required the jury to separately evaluate Pacific Bell's delivery performance for each of the 163 directories at issue. Consequently, the verdict form was structured so that the jury had to determine with respect to each of the 163 directories whether Pacific Bell breached its contractual obligation to the plaintiffs and caused injury to them, and if so, in what amount.

The jury returned a verdict in plaintiffs' favor as to 66 of the 163 directory districts for which plaintiffs had claimed a breach of contract, and specified separate damage amounts for each of the 66 different districts, totaling approximately $17.35 million in damages. In rendering its verdict, it appears that for all but two directory districts the jury used a 94.5 percent composite CAC score as its baseline for determining whether and to what extent Pacific Bell had breached the contract. For the 2002 Los Angeles directory, the jury used an 89.5 percent score, and for the 2003 San Francisco directory, it used an 89.6 percent baseline score.

However, after the jury returned its verdict, the trial court directed the clerk not to enter judgment on the verdict, and granted Pacific Bell's motion for a judgment notwithstanding the verdict (JNOV).[4] The court acknowledged the record contained

---

[4] The motion ultimately granted by the trial court was made originally as a motion for directed verdict at the close of the evidence, but the trial court deferred ruling on it until after the jury rendered its verdict. While the parties and the trial court continued to refer to the motion ultimately granted as one for a "directed verdict," it became a motion for JNOV by the time it was considered by the court, as explained in *Ammari I, supra*, A126326.

5

evidence supporting the jury's verdict that Pacific Bell had breached the contract by failing to deliver directories in good faith using best efforts and due diligence, although a contrary finding would also have been supported. Nevertheless, the court found "there is no substantial evidence from which the jury could determine whether harm was caused either as to the class as a whole or on a book-by-book basis." In particular, it found no basis in the evidence that would have permitted the jury to find different CAC percentages appropriate for different books, and it believed the CAC scores inherently understated the number of books actually delivered. Judgment was entered for Pacific Bell on June 30, 2009.

In *Ammari I*, plaintiffs appealed from the order granting judgment for Pacific Bell notwithstanding the verdict, and sought a new trial on the grounds the trial court should have construed the contract to include an implied obligation for Pacific Bell to deliver the directories in accordance with the industry standard, under which the damages would likely have been twice the amount of the jury's verdict. *Ammari I* denied plaintiffs a new trial, but reversed the JNOV in favor of Pacific Bell. The panel found the trial court had correctly instructed the jury that the contract required Pacific Bell to "deliver directories in [each] directory area . . . using best efforts and due diligence," but did not specify " 'any particular result in terms of number or percentage of directories delivered.' " (*Ammari I*, *supra*, A126326.) With regard to the JNOV, the panel found that as long as the fact of damages was established—that plaintiffs paid for advertising distribution services they did not receive—the law only required that the best evidence be adduced of their amount as the nature of the case permitted. The appellate court found the plaintiffs' evidence, viewed in the most favorable light under the applicable standard of review of an order granting a JNOV, was sufficient to support the jury's baseline determinations and not so speculative as to render it invalid.[5] *Ammari I* reinstated the jury's verdict and directed the trial court to enter judgment accordingly.

---

[5] The Court of Appeal rejected arguments the verdict was fatally undermined by the failure of plaintiffs' damages expert to pinpoint an exact percentage of deliveries that

6

On remand, the trial court entered judgment in the principal amount of $17,350,217, with prejudgment interest of $5,333,628.96. Pacific Bell timely appealed from the judgment.

## II. DISCUSSION

Pacific Bell contends the judgment must be reversed because (1) the trial court should not have certified the case as a class action, (2) the named plaintiffs' claims were not typical of the claims of advertisers in other directories, (3) there was no substantial evidence Pacific Bell breached its contracts with plaintiffs, and (4) the damages awarded are excessive. Before reaching the merits of these arguments, we address plaintiffs' position that some or all of them are barred by the law-of-the-case doctrine or by principles of waiver and judicial estoppel.

### A. *Law-of-the-case Doctrine*

Plaintiffs maintain the law-of-the-case doctrine is fatal to Pacific Bell's appeal to the extent it relies on "the same sufficiency-of-the-evidence challenges that [Pacific Bell] previously raised in unsuccessfully defending the trial court's JNOV" in *Ammari I*. We find the law-of-the-case doctrine has only a tangential application to the issues presented in this case. It is not dispositive of any of Pacific Bell's main contentions.

As an initial matter, we disagree that Pacific Bell conceded in litigating *Ammari I* there was a sufficient factual basis to support the jury's findings of breach of contract. The purported concession apparently derives from the following language in a footnote in Pacific Bell's respondent's brief in *Ammari I*: "*Given the trial court was correct that the Advertisers failed to present substantial evidence from which a jury could find harm*, [Pacific Bell] is not challenging the trial court's view that the jury could have properly found either way on whether [Pacific Bell] used good faith and best efforts in delivering its directories." (Italics added.) This comment must be viewed in context. In announcing its JNOV ruling, the trial court had observed in passing that the record

would constitute a best efforts delivery performance, or by flaws in the way the CAC surveys were conducted.

7

contained evidence from which the jury could properly find, as it did, that Pacific Bell breached the contracts, but that a contrary finding on that element would also have been supported. Since that view of the breach evidence was not logically irreconcilable with the trial court's favorable JNOV ruling, Pacific Bell simply chose not to challenge it in *Ammari I*. That is not a concession of the issue for purposes of this appeal. Furthermore, no legal rule required Pacific Bell to make every argument it could have made for upholding the JNOV in the prior appeal, or be foreclosed from making it in a future appeal from the judgment, as plaintiffs suggest.

Out of an abundance of caution, Pacific Bell did file a protective cross-appeal in *Ammari I* to preserve "a full opportunity to challenge in the trial court by post trial motions and thereafter in the Court of Appeal by way of appeal any judgment entered in Plaintiffs['] favor as a result of this appeal." Plaintiffs moved to dismiss the cross-appeal, arguing it was unnecessary to preserve Pacific Bell's appellate rights: "If the defense judgment . . . is reversed and remanded to the Superior Court, that court should follow the usual procedure of entering a judgment on the jury verdict. [Citation.] [Pacific Bell] may then seek whatever relief it is entitled to at that time and, if such relief is denied, appeal as permitted by the Code of Civil Procedure." Plaintiffs also argued the protective cross-appeal was unnecessary to preserve Pacific Bell's right to appeal the trial court's class certification rulings. The Court of Appeal agreed with plaintiffs, and dismissed the cross-appeal. At Pacific Bell's request, the court modified the dispositional paragraph in *Ammari I* after the opinion was filed to specify that its affirmance of the judgment in plaintiffs' favor to be entered on remand was "without prejudice to any postjudgment and appellate rights possessed by Pacific Bell." In our view, to now hold *Ammari I* precludes Pacific Bell from raising any sufficiency-of-the evidence challenge to the judgment would directly conflict with the premise upon which Pacific Bell's protective cross-appeal was dismissed and with the dispositional language chosen by the Court of Appeal in its *Ammari I* opinion.

The law-of-the-case doctrine has been stated as follows: " 'The decision of an appellate court, stating a rule of law necessary to the decision of the case, conclusively

8

establishes that rule and makes it determinative of the rights of the same parties in any subsequent retrial or appeal in the same case.' " (*Morohoshi v. Pacific Home* (2004) 34 Cal.4th 482, 491, quoting 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 895, p. 928.)  The law-of-the-case doctrine is thus binding on a party to the prior appeal although the party did not take the appeal.  (See *Penziner v. West American Finance Co.* (1937) 10 Cal.2d 160, 167–170; *Clark v. Deschamps* (1952) 109 Cal.App.2d 765, 768.) An appellate court's decision on the sufficiency of the evidence comes within the doctrine.  (*Wells v. Lloyd* (1942) 21 Cal.2d 452, 455; 9 Witkin, Cal. Procedure (5th ed. 2008) § 470, p. 528, citing cases.)

Plaintiffs contend *Ammari I decided* rather than assumed there was substantial evidence Pacific Bell breached its contract with plaintiffs.  We do not read the decision that way.  Plaintiffs pick out the following isolated sentences from *Ammari I*, which they maintain bar the present appeal:  (1) "Notwithstanding evidence supporting the jury's finding that the contract had been breached, the court found that judgment should be entered for Pacific Bell because plaintiffs had failed to prove they had been harmed by any actions on Pacific Bell's part"; (2) "Where, as here, plaintiffs are clearly damaged by a breach of contract—they paid for advertising distribution services that they did not receive—they will not be denied recovery simply because precise proof of the amount of damage is not available"; and (3) "Tested by the standards set out in these cases, and viewing plaintiffs' evidence in the most favorable light as we are required to do under our standard of review, we conclude plaintiffs' evidence was sufficient to support the jury's baseline determination."  (*Ammari I, supra*, A126326; hereafter referred to as sentences (1), (2) and (3).)

In our view, sentence (1) simply refers back to the *trial court's* determination there was evidence to support the jury's finding of breach, which Pacific Bell did not challenge on appeal.  The Court of Appeal in *Ammari I* simply *assumed* that analysis of the breach of contract evidence was correct for purposes of the first appeal since no party contested it, and it involved a different element of the contract cause of action than the proof of harm element on which the trial court's JNOV ruling rested.

9

The focus of sentence (2), as shown by the context in which it appeared and the case citation immediately following it,[6] was on the distinction between proof of the *fact* a party was damaged by a breach of contract, without which there is no cause of action, and proof of the *amount* of damages caused by such breach, which need not be very strong in order to support an award. The Court of Appeal found there was clear evidence of damage. It was not concerned with the evidence of breach because that issue was not in dispute for purposes of the appeal, nor was there any dispute that Pacific Bell billed all but a few advertisers in full for advertising charges, notwithstanding assumed breaches. As the Court of Appeal noted, Pacific Bell did not challenge restitution of advertising charges as an appropriate remedy if the contract was in fact breached. Thus sentence (2) is based on an implicit assumption about the sufficiency of the breach evidence, and the absence of any dispute over Pacific Bell's advertising charges, but it states no rule of law that the evidence of either was sufficient.

Sentence (3) does reflect an actual decision by the Court of Appeal about a sufficiency-of-the-evidence issue, namely, whether plaintiffs' evidence concerning the CAC surveys was sufficient to support the baseline CAC levels the jury used to calculate damages. The court decided that evidence did provide a "reasonable basis of computation" of the different baseline amounts the jury used for those calculations. (*Ammari I, supra*, A126326.) The evidence in question was not the CAC data itself, but the testimony of plaintiffs' expert concerning "industry standards, Pacific Bell's own internal policies and standards for delivery, Pacific Bell's promotional materials, Pacific Bell's standards for its third-party distribution vendors and Pacific Bell's historic performance." (*Ibid*.) The appellate court characterized this expert testimony as encompassing "a wide range of factors" from which the jury—consistent with the instruction that the contracts did not require Pacific Bell to achieve any particular

---

[6] *Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 14, footnote 3.

percentage delivery result—could determine the benchmark to be used to approximate damages in each directory district. (*Ibid.*)

Importantly, the evidence declared sufficient by sentence (3) was *not* the same evidence the court used earlier in the opinion to exemplify the breach of contract evidence it found in the trial record. The latter consisted of (1) "evidence of ongoing, severe problems in delivering directories, including many documented, out-of-court admissions by Pacific Bell's own distribution managers acknowledging delivery failures"; (2) "written acknowledgement that Pacific Bell's third-party distribution vendor 'fail[ed] to perform at the basic competency level' and that emergency procedures needed to be implemented"; and (3) evidence that Pacific Bell "terminated PDC after criticizing its delivery effort during the first half of the class period," and "terminated the replacement distributor, ClientLogic, for 'failure to perform' . . . after repeated criticism of its delivery performance."[7] (*Ammari I, supra*, A126326.) In other words, sentence (3) was not intended by the Court of Appeal as a statement about the sufficiency of the evidence it believed supported the jury's breach of contract finding, which was not in issue. It was a statement about the sufficiency of the specific expert testimony it believed the jury used or could have used as a basis to quantify damages. Sentence (3) does not express or imply a rule of law that is determinative of Pacific Bell's breach of contract claim in this appeal.

We also reject plaintiffs' arguments that the law-of-the-case doctrine precludes Pacific Bell's claim the jury awarded excessive damages as well as its challenge to the trial court's class certification rulings. While plaintiffs assert Pacific Bell's claim of excessive damages rests on the same evidence and arguments that the appellate court

---

[7] These were offered as examples of breach evidence, not as an exhaustive recitation of all of the evidence on which plaintiffs may have relied. It is clear from the trial court record plaintiffs also offered the CAC survey results to show Pacific Bell breached its contracts by failing to deliver its telephone directories to a substantial number of its business and residential customers throughout California. The Court of Appeal had no occasion in *Ammari I* to evaluate the sufficiency of any of this evidence to show breach of contract.

rejected in *Ammari I*, they fail to specify what rule of law necessary to the decision in that appeal is determinative of whether the jury's damage award was excessive. In fact, the Court of Appeal in *Ammari I* did not consider or decide that issue. The court merely decided whether there was some reasonable basis for computation of damages in the record. While there is some overlap in Pacific Bell's arguments on damages between the two appeals, those arguments were offered in *Ammari I* to show a failure to prove harm in that the jury's entire damage award was grounded in nothing more than speculation and conjecture. In this appeal Pacific Bell asserts the CAC scores failed to take account of the full 12-month distribution effort that assertedly made up for deficiencies in the initial hand-delivery phase. These are related, but distinct issues.

As discussed in the next section, the rule of law stated in sentence (3) of *Ammari I* identified above is relevant to one of the issues Pacific Bell now raises concerning class certification. However, that one issue is not dispositive of Pacific Bell's position on class certification. *Ammari I* itself did not address any issue of class certification that had been raised in the trial court. In fact, as already noted, when Pacific Bell attempted to challenge the trial court's class certification rulings by means of its cross-appeal in *Ammari I*, plaintiffs successfully moved to dismiss the cross-appeal, arguing it would be premature to decide class certification issues in that appeal. Before that, Pacific Bell's petition for a writ of mandate to overturn the class certification order was summarily denied. (*Pacific Bell v. Superior Court* (Dec. 5, 2007, A119392.) It would be a misuse of the law-of-the-case doctrine to now turn the tables on Pacific Bell and hold it is not entitled to *any* appellate review of the trial court's class certification rulings on the merits.

**B.** *Waiver and Estoppel*

Plaintiffs contend Pacific Bell's appeal is prohibited by the doctrine of waiver because Pacific Bell has appealed only the portion of the classwide judgment in plaintiffs' favor, while assertedly retaining the benefit of other portions of the judgment that are in its favor. Plaintiffs also contend Pacific Bell is judicially estopped from

12

asserting certain positions in this appeal that are inconsistent with its prior litigation positions.  We find neither claim meritorious.

The judgment entered on remand following *Ammari I* separately addressed the 66 directories where plaintiffs prevailed and the remaining 122 directories where no breach of contract was found (97 decided by the jury and 25 where plaintiffs did not present their claims to the jury).  Pacific Bell appealed only the portion of the classwide judgment addressing the 66 directories.  Plaintiffs point to the rule that a party waives its right to appeal any portion of a nonseverable judgment if it appeals only a portion of it and voluntarily accepts the benefits of the nonappealed portion.  (See *Epstein v. DeDomenico* (1990) 224 Cal.App.3d 1243, 1246 (*Epstein*) [accepting return of $75,000 cash security deposit under settlement barred appeal of other settlement provisions].)  The rule is based on the principle that " 'the right to accept the fruits of the judgment and the right to appeal therefrom are wholly inconsistent, and an election to take one is a renunciation of the other.' "  (*Ibid.*)  However, plaintiffs fail to cite any precedent for construing a finding of *nonliability* as conferring an economic gain or benefit on a party for purposes of the waiver doctrine.  Such a rule would make no sense.  A plaintiff who prevails against one defendant but not others is not barred from appealing the judgment in favor of the other defendants.  By the same token, a defendant found not liable to some but not all plaintiffs in a multi-plaintiff case is generally not barred from appealing only those portions of the judgment finding it liable.  Here, the losing plaintiffs did not pay or transfer anything of value to Pacific Bell as a result of the partial judgment in Pacific Bell's favor.  (See *American Alternative Energy Partners II v. Windridge, Inc.* (1996) 42 Cal.App.4th 551, 558 [no waiver where defendant did not pay or transfer anything to appellants as a result of the judgment dismissing their claims].)  Merely appealing from the portion of a mixed judgment imposing liability on the appellant, without more, is not the acceptance of a benefit from the judgment for purposes of the waiver doctrine.

There is also an exception to the waiver rule where a reversal has no effect on the appellant's right to the benefit he or she has "accepted."  (*Epstein, supra*, 224 Cal.App.3d at p. 1246.)  If this court were to reverse the judgment on the ground that no substantial

evidence supported the jury's verdicts finding breach of contract, or the extent of damages awarded, as Pacific Bell urges, this would have no effect on the portions of the judgment in Pacific Bell's favor. On the other hand, if we reversed based on error in granting class certification, the entire class judgment would have to be reversed, all class members would be free to pursue their individual claims against Pacific Bell, and any res judicata effect of the portions of the judgment in its favor would be nullified.[8] On that supposition, there is no waiver either because the appeal would undo all portions of the judgment, not just those unfavorable to Pacific Bell.

Plaintiffs further contend Pacific Bell should be judicially estopped from challenging class certification on appeal because it took an inconsistent position by successfully advocating for a classwide judgment to be entered on the jury's verdict on remand after the decision in *Ammari I*. Judicial estoppel applies when "(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake." (*Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 183.) Judicial estoppel generally applies to taking inconsistent factual positions amounting to an intentional fraud on the court. (*ABF Capital Corp. v. Berglass* (2005) 130 Cal.App.4th 825, 832.)

Plaintiffs maintain that by seeking entry of a classwide judgment conclusive of the claims of thousands of absent class members Pacific Bell necessarily took the position that the trial court's certification of the class was proper. We disagree. By seeking entry of a judgment in accordance with the special verdict, Pacific Bell was not taking any "position"—factual or legal—on the issues of class certification. It was not seeking an

---

[8] Individual claims would also not be time-barred. (See *Becker v. McMillin Construction Co.* (1991) 226 Cal.App.3d 1493 and cases cited therein [statute of limitations on putative class members' individual claims tolled between commencement of class action and decertification of class].)

adjudication from the court of any such question. It was merely requesting performance of a ministerial act required by law and by *Ammari I*'s direction to the trial court to enter judgment on the jury's verdict. Judicial estoppel has no application in these circumstances.

We now turn to the merits of Pacific Bell's contentions.

## C. *Class Certification*

Pacific Bell submits the trial court's decision to certify this as a class action was erroneous and the judgment must be reversed because (1) there was no common evidence of breach sufficient to demonstrate classwide liability, and (2) the named plaintiffs' claims were not typical of the claims of advertisers in other directories.

### 1. *Commonality*

A trial court's decision to certify a class "rests squarely within the discretion of the trial court, and we afford that decision great deference on appeal, reversing only for a manifest abuse of discretion." (*Fireside Bank v. Superior Court* (2007) 40 Cal.4th 1069, 1089 (*Fireside Bank*); accord, *Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435.) "A certification order generally will not be disturbed unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions." (*Fireside Bank*, at p. 1089, citing *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326–327 (*Sav-On Drug Stores*).)

"Class certification requires proof (1) of a sufficiently numerous, ascertainable class, (2) of a well-defined community of interest, and (3) that certification will provide substantial benefits to litigants and the courts, i.e., that proceeding as a class is superior to other methods. [Citations.] In turn, the 'community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class.' " (*Fireside Bank, supra,* 40 Cal.4th at p. 1089.) " 'As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.' " (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th

15

1004, 1022 (*Brinker*).) In this case, Pacific Bell is contending in substance that no substantial evidence supported the trial court's determination that common issues of law or fact predominated.

"[A] reviewing court is not authorized to overturn a certification order merely because it finds the record evidence of predominance less than determinative or conclusive. The relevant question on review is whether such evidence is *substantial*." (*Sav-On Drug Stores, supra*, 34 Cal.4th at p. 338.) The fact that some issues are amenable to classwide determination and others are not does not prevent class certification. The legal standard for commonality is comparative: "The relevant comparison lies between the costs and benefits of adjudicating plaintiffs' claims in a class action and the costs and benefits of proceeding by numerous separate actions— not between the complexity of a class suit that must accommodate some individualized inquiries and the absence of any remedial proceeding whatsoever." (*Id.* at p. 339 & fn. 10, italics omitted.)

The trial court's original certification order relied in part on the fact that putative class members entered into a uniform standardized contract with Pacific Bell such that the interpretation of the contract and the nature of the obligation it imposed on Pacific Bell to deliver directories presented common issues of law and fact. Pacific Bell does not appear to dispute this premise. In fact, the trial court cited *Discover Bank v. Superior Court* (2005) 36 Cal.4th 148, 157, for the proposition that controversies involving widely used contracts are *ideal* cases for class adjudication. With regard to liability issues, the court initially contemplated a liability trial in which liability and damages, if any, would be determined on an aggregate basis, perhaps based on a statistical sampling of actual delivery rates around the state in comparison to a uniform, contractually required minimum delivery rate to be determined by interpretation of the contract, after which the court and the parties would devise a plan for distributing any damages awarded to the class members. The trial court understood at that stage of the litigation that it was relying of necessity on *assumptions* about how plaintiffs would prosecute their claims,

assumptions that changed as the case proceeded closer to trial, causing Pacific Bell to make two subsequent motions to decertify the class.

By the time of the first such motion, plaintiffs' plan for a single, classwide determination of liability had been replaced by a plan to have a proposed verdict form with lines for each of the 163 directories, and to allow the jury to hear evidence on selected distribution areas chosen at random or by the parties. While recognizing this would complicate the trial, the trial court concluded: "Plaintiffs continue to demonstrate that common issues will predominate on a sufficient number of common critical issues and that a trial on the contract claim will be both manageable and have benefits for the Court and the litigants."

Pacific Bell's final decertification motion came after the trial court determined that the contracts obligated it to use good faith and best efforts to deliver the directories, but did not require any particular delivery percentage or CAC score. Pacific Bell insisted this precluded proof of breach on a classwide basis. Pacific Bell highlighted factors that in its view created a "disconnect" between its distribution effort and the results achieved—factors that would vary between locations within a particular directory area.[9] Plaintiffs maintained they could produce "statistical and non-statistical evidence of [Pacific Bell's] class-wide conduct," including internal memos acknowledging ongoing delivery problems and failure to meet Pacific Bell's own minimum requirements, evidence of deficient delivery methods, evidence of the industry standard, and CAC scores showing a failure to meet internal and industry standards. The trial court agreed with plaintiffs, finding with regard to liability that common evidence such as industry standards, Pacific Bell's past performance, and its efforts and actions in retaining and supervising the distribution vendors, were sufficient to show the predominance of

---

[9] Pacific Bell stated: "The distribution results will likely be lower in areas with concentrated populations where English is not the primary language. . . . Areas with heavy concentrations of controlled access buildings like apartments and condominiums often see lower penetration . . . than non-secure locations due to refusals, or bulk drops."

common questions.  The court also rejected Pacific Bell's proposal of a subclass for each directory area.

In this appeal, Pacific Bell attacks certification of the class on somewhat different grounds, relying primarily on two United States Supreme Court decisions decided after Pacific Bell's decertification motions were heard in this case, *Wal-Mart Stores, Inc. v. Dukes* (2011) ___ U.S. ___ [131 S.Ct. 2541] (*Wal-Mart*) and *Comcast Corp. v. Behrend* (2013) ___ U.S. ___ [133 S.Ct. 1426] (*Comcast*).  According to Pacific Bell, these cases stand for the proposition that statistical evidence cannot satisfy a plaintiff's burden to establish that liability can be litigated on a classwide basis when liability "turns on the unique factual context of the defendant's conduct."  We find these cases distinguishable.

*Wal-Mart* involved "one of the most expansive class actions ever," with a plaintiffs' class of 1.5 million current and former employees of the store who alleged that "the discretion exercised by their local supervisors over pay and promotion" discriminated against women.  (*Wal-Mart, supra*, 131 S.Ct. at p. 2547.)  The plaintiffs' theory was that a discriminatory corporate culture infected the discretionary decision-making of thousands of Wal-Mart managers leading to pay and promotion decisions disproportionately favoring male employees.  (*Id*. at p. 2548.)  As evidence there were questions of law and fact common to the plaintiffs' class, the plaintiffs offered (insofar as relevant here) (1) statistical evidence about pay and promotion disparities between male and female employees, and (2) anecdotal reports of discrimination from about 120 female employees.  (*Id*. at p. 2549.)  The court evaluated this evidence and found it insufficient under the following standard: certification of the case as a class action required " 'significant proof' " that Wal-Mart operated under a general policy of discrimination. (*Id*. at p. 2553.)

The statistical evidence consisted of a regression analysis conducted at the named plaintiffs' behest, using regional and national data, comparing the number of women promoted into management positions with the percentage of women in the available pool. (*Wal-Mart, supra*, 131 S.Ct. at p. 2555.)  The study found significant disparities that could only be explained by gender discrimination, according to the study's authors.

18

(*Ibid*.) The court found this evidence about disparities at the regional and national level did not establish the existence of disparities at individual stores or raise any inference of a *companywide* policy of discrimination implemented by *discretionary decisions made at the store level*. (*Ibid*.) Because the *Wal-Mart* plaintiffs had identified no alleged discriminatory practice other than delegated discretion, the court found merely showing that such discretion produced an *overall* sex-based disparity was insufficient. (*Id*. at pp. 2555–2556.) It found the anecdotal evidence even weaker in that regard since the evidence encompassed only a tiny fraction of Wal-Mart's employees and stores, concentrated in a relative handful of states, which failed to demonstrate the company operated under a *general* policy of discrimination. (*Id*. at p. 2556.)

In *Comcast*, an antitrust class action, the Supreme Court reversed an order granting class certification because the plaintiffs relied on a regression model that did not "isolate damages resulting from any one theory of antitrust impact," despite the fact that the plaintiffs were limited by other rulings to pursuing damages under only one of the theories reflected in the model. (*Comcast, supra,* 131 S.Ct. at p. 1431.) The Court concluded that "a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory." (*Id*. at p. 1433.)

California courts may look to federal law for guidance on class action procedure in the absence of California authority. (*In re BCBG Overtime Cases* (2008) 163 Cal.App.4th 1293, 1298.) There is certainly state law precedent that statistical evidence can be used to prove liability in California class actions, however. (See, e.g., *Sav-On Drug Stores, supra*, 34 Cal.4th at p. 333 & fn. 6; *Bell v. Farmers Ins. Exchange* (2004) 115 Cal.App.4th 715, 749–755; *Capitol People First v. State Dept. of Developmental Services* (2007) 155 Cal.App.4th 676, 695–696; *Alch v. Superior Court* (2004) 122 Cal.App.4th 339, 380–381; *Reyes v. Board of Supervisors* (1987) 196 Cal.App.3d 1263, 1279; *Stephens v. Montgomery Ward* (1987) 193 Cal.App.3d 411, 421.) In any event, we do not read *Wal-Mart* and *Comcast* as precluding the use of statistical evidence in class actions as long as that evidence—either by itself or in combination with other evidence—is capable of showing liability on a classwide basis.

19

This is substantially a case-by-case determination, not a sweeping rule. Moreover, the applicable standard in California is not " 'significant proof' " of classwide liability, as stated in *Wal-Mart, supra*, 131 S.Ct. at page 2553, but whether, presuming the existence of every fact the trial court could reasonably deduce from the record, substantial evidence supports the trial court's finding that common issues predominate. (*Brinker, supra*, 53 Cal.4th at p. 1022.)

Pacific Bell concedes in this case that in addition to the CAC surveys plaintiffs came forward with evidence of *systemic* distribution problems—problems with Pacific Bell's distribution vendors reflecting " 'widespread, ongoing concerns [about distribution] . . . that the jury *could reasonably infer applied to all districts*.' "[10] (Italics added.) Pacific Bell nonetheless dismisses this evidence as insufficient to sustain class certification because, if its delivery problems were systemic, the jury would have found breach of the best efforts requirement in *all* directory areas across the board. This conflates different evidentiary standards. To sustain certification, plaintiffs did not have to establish Pacific Bell's classwide liability as a fact to the satisfaction of the jury. They only had to come forward at the certification stage with substantial evidence from which a reasonable jury *could have* inferred classwide liability. Plaintiffs clearly did so in this case. Not only did plaintiffs come forward with evidence of classwide delivery problems, as Pacific Bell concedes, they also came forward with CAC scores and expert testimony which, had it been fully accepted by the jury, would have resulted in classwide (or virtually classwide) liability findings and damages. As pointed out in *Ammari I*, plaintiffs argued to the jury—consistent with the jury instructions—that the CAC evidence could support a baseline standard of performance of anywhere from 96 to 100

---

[10] This evidence included numerous internal memoranda discussing vendor delivery failures, inadequate staffing, " 'cutting corners,' " the absence of quality assurance programs, multiple incidents of book dumping, and the failure of vendors to achieve minimum delivery requirements.

percent of intended recipients, as measured by the CAC surveys.[11]  Pacific Bell made no objection at the time that any number in the range proposed was unsupported by substantial evidence.  Had the jury accepted the higher figures urged by plaintiffs—100 percent or 99 percent or even 98 percent—it would have found liability for every or nearly every directory.  The fact the jury did not fully embrace plaintiffs' position—after hearing *all* of the testimony and evidence on *both* sides—is not particularly relevant to our review of the trial court's certification rulings.  If representative plaintiffs had the burden of *proving* classwide liability at the certification stage as Pacific Bell seems to be suggesting, trials on the merits would be superfluous in class actions.

Moreover, the statistical and other evidence in issue in this case does not suffer from the infirmities identified in the *Wal-Mart* and *Comcast* cases.  First, unlike in those cases, the statistical data relied on by plaintiffs was not created by their expert for purposes of the litigation.  The CAC data was generated specifically *for* Pacific Bell and was considered sufficiently reliable that Pacific Bell (and *all* members of the industry) regularly used the same methodology in evaluating their own delivery performance, vendors, and personnel.  Second, plaintiffs' experts testified without rebuttal that CAC scores provided an accurate metric for evaluating delivery performance.  Third, the statistical evidence was found to be insufficient in *Wal-Mart* because it relied on aggregating data generated from many different units operating independently to make unfounded generalizations about the conduct of every one of the units.  In contrast, the CAC data was disaggregated.  Each CAC score directly measured Pacific Bell's performance in the delivery of a single directory.  The only generalization involved in the creation of those scores was an extrapolation from the sample of Pacific Bell customers surveyed in a directory area to the area's customer population.  Random sampling for that type of purpose is a pretty basic statistical technique amenable to objective evaluation by

---

[11] This evidence included not only the CAC survey results but evidence of industry standards, Pacific Bell's own internal policies and standards for delivery, Pacific Bell's promotional materials, Pacific Bell's standards for its third party distribution vendors, and Pacific Bell's historic performance.

experts.  We do not view *Wal-Mart* as banning the use of sampling data in class action cases as long as there is credible (indeed, unrebutted) expert testimony attesting to its reliability in measuring  probative facts, as there was in this case.

Finally, we reject Pacific Bell's complaint, analogizing to *Wal-Mart*, that the CAC scores are defective because they fail to demonstrate the reasons for nondelivery.  This is not a discrimination case.  Plaintiffs were not required to prove the reason for each nondelivery.  They were only required to produce evidence from which the jury could infer what portion of the nondeliveries were due to reasons Pacific Bell could not have controlled had it exercised its best efforts.  Whether the evidence in this case permitted those types of inferences was essentially the same question that was before the Court of Appeal in *Ammari I*.  As discussed earlier, the Court of Appeal specifically found the evidence was sufficient to support the baseline levels the jury used to calculate damages.  By setting CAC baseline levels of 94.5, 89.6, and 89.5 percent for purposes of calculating damages, the jury was effectively drawing inferences from the evidence as to the percentage of nondeliveries that were due to factors independent of Pacific Bell's level of effort.  Under the law-of-the-case doctrine, we need not revisit here the issue of whether the evidence was in fact sufficient for the jury to make those determinations**.**

For all of these reasons, we find *Wal-Mart* and *Comcast* distinguishable, and reject Pacific Bell's argument that plaintiffs failed to show the predominance of common issues.

### 2. *Typicality*

Another aspect of the "community of interest" requirement for class certification is that the named plaintiffs' claims must be typical of the class.  (*Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th 1096, 1104.)  Typicality does not require that plaintiffs' claims be identical to those of other class members, only that their claims and the defenses applicable to them are sufficiently similar to those of other class members that the named plaintiffs are able to adequately represent the class and focus on common issues.  (*Classen v. Weller* (1983) 145 Cal.App.3d 27, 46; *Medrazo v. Honda of North Hollywood* (2008) 166 Cal.App.4th 89, 99 (*Medrazo*).)  Typicality and adequacy

requirements apply equally to subclasses. (*Aguiar v. Cintas Corp. No. 2* (2006) 144 Cal.App.4th 121, 137.)

" 'The test of typicality "is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." [Citation.]' " (*Seastrom v. Neways, Inc.* (2007) 149 Cal.App.4th 1496, 1502.) "It is only when a defense unique to the class representative will be a major focus of the litigation [citation], or when the class representative's ' "interests are antagonistic to or in conflict with the objectives of those [s]he purports to represent" ' [citation] that denial of class certification is appropriate." (*Medrazo, supra*, 166 Cal.App.4th at p. 99.)

Here, Pacific Bell asserts (1) the trial court "effectively" created subclasses by requiring the jury to determine liability and damages separately for each of the 163 directories, (2) the named plaintiffs advertised in only 8 of the 66 directories for which the jury found it liable, and (3) the claims of an advertiser in one directory were not typical of the claims of advertisers in other directories. Based on these premises, Pacific Bell maintains it is entitled to a reversal of the judgment as to the 58 directories that assertedly lacked a typical and adequate subclass representative.

We reject Pacific Bell's claim that the named plaintiffs were not similarly situated to the advertisers in the other directories in which they did not advertise. Using Pacific Bell's illustrative example, the basis of this claim is that one of the named plaintiffs advertising in the 2002 Oakland directory with a CAC score of 93.7 percent had to prove the baseline delivery percentage was higher than 93.7 percent to recover, whereas an advertiser in the 2003 Palo Alto directory only needed to prove the baseline was higher than 92.6 percent, which was the CAC score for that directory. Although Pacific Bell finds this presents "an intractable class conflict," we do not see it that way. The named plaintiffs and the advertisers in other directories shared the same litigation objective—to maximize damages by convincing the jury to pick the highest possible baseline delivery percentage. Pacific Bell fails to explain why the named plaintiff who advertised in the 2002 Oakland directory would have had an incentive to convince jurors to reduce the

baselines applicable to any of the other directories. Such an effort would have been self-defeating. The named plaintiffs' claims were sufficiently typical of the class because they involved the same standardized contract and the same alleged breach as in all 163 of the directories. No subclasses were necessary.

Pacific Bell fails to demonstrate error in the trial court's class certification rulings.

**D.** *Sufficiency of the Breach of Contract Evidence*

**1.** *Jury's Improper Reliance on CAC Scores*

Pacific Bell acknowledges there was some "anecdotal" evidence of delivery failure other than CAC scores for 11 of the 66 directories for which damages were awarded but maintains the CAC scores were the only evidence of breach the jury relied on for the other 55 directories. Pacific Bell urges us to find that both the CAC data and the evidence it characterizes as anecdotal were insufficient to support the jury's findings of breach. In fact, counsel for Pacific Bell stressed at oral argument that the jury—by purportedly relying exclusively on the CAC survey results— *disregarded* the trial court's instruction that "[t]he contracts do not require Pacific Bell Directory to achieve any particular result in terms of number or percentage of directories delivered," and in fact did exactly what the trial court instructed them *not* to do by treating the contract as if it did require a particular delivery percentage.

On appeal, we must assume the jury understood the instructions and correctly applied them to the evidence unless the contrary is convincingly demonstrated. (*Zuckerman v. Underwriters at Lloyd's* (1954) 42 Cal.2d 460, 478–479.) We indulge all reasonable inferences to support rather than defeat the jury's verdict, and presume the jury reached its verdict on a theory that is supported by the evidence. (*Fransen v. Washington* (1964) 229 Cal.App.2d 570, 574; *Petersen v. Rieschel* (1953) 115 Cal.App.2d 758, 767.)

Pacific Bell fails to persuade us the jury misunderstood or ignored the instructions given in this case. Although the jury was instructed that the contracts did not require Pacific Bell to achieve any particular percentage of directories delivered, that does not mean the jury could not consider the results of Pacific Bell's delivery efforts, as

24

measured by the CAC surveys, as evidence from which to infer, *after the fact*, that the company had breached its obligation to use best efforts. *First Union Nat'l Bank v. Steele Software Sys. Corp.* (Md.Ct.App. 2003) 838 A.2d 404 is illustrative. The defendant bank in that case agreed to use its best efforts to refer certain types of transactions to the plaintiff. (*Id.* at p. 412.) The jury determined that "42-52% of [the defendant's] business was required to meet the diligence requirement of a best efforts clause under the circumstances." (*Id.* at p. 452.) The jury's quantitative interpretation of best efforts was permissible even though the contract "did not create a specific obligation to direct a certain percentage of [the defendant's] transactions to [the plaintiff]." (*Id.* at p. 450.) The court stated: "We do not read the damage award as an indication that the jury concluded that the parties made a specific agreement to give a certain percentage, but rather as a determination by the jury, after the fact, of what level of business would have resulted from reasonably diligent efforts." (*Ibid.*)[12]

When a contract does not define the phrase "best efforts," the promisor must use the diligence of a reasonable person under comparable circumstances. (*California Pines Property Owners Assn. v. Pedotti* (2012) 206 Cal.App.4th 384, 395.) Here, the jury heard testimony that CAC scores of anywhere from 96 to 100 percent of intended recipients provided a baseline standard of performance in the industry, and that Pacific Bell itself used 96 percent as the "minimum delivery requirement" for its vendors. The jury could have reasonably inferred that a failure to achieve distribution results for a directory at those levels, as measured by a CAC survey, was probative of a failure to use

---

[12] See also *Levin v. Grecian* (N.D.Ill. 2013) ___ F.Supp.2d ___ [2013 U.S.Dist. Lexis 76536] at *24 ["although the Agreement did not obligate Levin to actually succeed in selling anything, a reasonable factfinder could find the admitted quality of Grecian's work and the speed with which *The Yard* was sold once Fishman was brought onboard, combined with Levin's failure to sell any of Grecian's work before then, to be persuasive evidence that Levin did not exercise his best efforts"]; *Carlson Dist. Co. v. Salt Lake Brewing Co., L.C.* (Utah Ct.App. 2004) 95 P.3d 1171, 1178–1179 [sales performance of a comparable distributor of plaintiff's beer would be relevant to prove whether defendant distributor breached best efforts clause, if it occurred under similar circumstances].)

best efforts and due diligence in the distribution effort, absent credible evidence that other factors extrinsic to Pacific Bell's effort caused the result. We simply disagree with Pacific Bell's assertion that while the CAC scores may have constituted admissible evidence of breach, the "scores alone [could not] constitute substantial evidence of breach in light of the governing contractual obligations and the instructions given to the jury."

We also disagree with Pacific Bell's premise that the CAC scores were plaintiffs' only evidence of breach for some directories. As the Court of Appeal pointed out in *Ammari I, supra,* A126326, there was evidence of severe, ongoing problems in delivering directories, reflected in internal memoranda. For example, Pacific Bell acknowledged in writing that its third party distribution vendor "fail[ed] to perform at the basic competency level," requiring implementation of emergency procedures. (*Ibid.*) There was evidence Pacific Bell terminated PDC after criticizing its delivery effort during the first half of the class period and also terminated the replacement distributor for failure to perform. In its reply brief in this appeal, Pacific Bell agreed with plaintiffs' position that in addition to the CAC surveys plaintiffs had put in evidence of *systemic* distribution problems reflecting " 'widespread, ongoing concerns [about distribution] . . . the jury *could reasonably infer applied to all districts*.' "[13] (Italics added.) Pacific Bell maintains, however, that the jury could not have relied on any of this evidence in finding breach, and must have relied solely on the CAC surveys, because it found no breach for 97 of the 163 directories. Not so.

Although the jury could have reasonably inferred the systemic evidence supported a finding of breach and an award of damages in all or nearly all districts, that was not the only rational use the jury could have made of that evidence. The jury could have

---

[13] This evidence included numerous internal memoranda discussing vendor delivery failures, inadequate staffing, " 'cutting corners,' " the absence of quality assurance programs, multiple incidents of book dumping, and the failure of vendors to achieve minimum delivery requirements. Pacific Bell stipulated it was legally responsible for the delivery performance of each of its distribution vendors.

26

accepted the evidence that delivery problems were systemic and believed CAC survey results of 96 or 98 or 99 percent were probative of breach, yet rationally decided to choose a lower baseline figure—94.5 percent in most districts— for purposes of awarding damages. The jury could have found there was sufficient imprecision in the CAC methodology, or variation in extrinsic circumstances between districts, or conflict in the evidence, that it would be unfair to Pacific Bell to find a "breach causing injury" and award damages unless the CAC survey result was far enough below industry norms and Pacific Bell's own internal standards that jurors could be *sure* it reflected a lack of adequate effort and diligence on Pacific Bell's part. In other words, the fact plaintiffs' evidence of widespread, systemic distribution problems might have supported a jury verdict even more adverse to Pacific Bell is certainly not a reason to assume the jury completely disregarded it in reaching the conclusion that Pacific Bell had liability to some of its directory advertisers.

## 2. *Deficiencies of CAC Data*

Pacific Bell also attacks the sufficiency of the CAC survey results on the grounds those results were "unadjusted," and addressed only the initial distribution. In using the term "unadjusted," Pacific Bell refers to the fact that CAC utilizes a process for some of its clients—but not used by Pacific Bell in this case—for challenging "no" responses by having CAC make follow-up calls to determine whether the nondelivery to the respondent was caused by lack of diligence in the delivery effort, or other factors, such as customer refusal to accept a delivery or customers whose telephone number is outside the delivery area.[14] We find Pacific Bell's issues with the CAC survey data go to the weight

---

[14] As part of its unadjusted results, CAC apparently does call respondents back more than once to verify whether the book was received, but not to determine the reason for nondelivery. Pacific Bell on some occasions conducted its own follow-up surveys by calling customers at random who had responded "no" in a CAC survey, and asking them again if they received a directory. Pacific Bell's witness said he found "30, 40, 50 percent of the time" these respondents said they had received the book even though they said "no" on the CAC survey. However, there was no expert testimony validating the reliability of these follow-up surveys.

of that evidence, not its legal sufficiency to support a verdict. Pacific Bell presented no expert testimony that adjusting the data by recalling and questioning respondents who answered "no" conformed to accepted survey practices or would quantify its delivery performance more reliably. It is not at all clear why respondents would have any first-hand knowledge of the reasons for nondelivery in most cases. Moreover, Pacific Bell used the unadjusted data to track its own performance and that of its distribution vendors, and plaintiffs' expert testified without rebuttal that the unadjusted CAC scores provided a reliable measure of the percentage of businesses and residences that received a particular directory. Even assuming the unadjusted survey responses undercounted deliveries, that effect was canceled out by the fact that the quantitative evidence the jury heard concerning performance norms and standards—and upon which the jury presumably arrived at its baseline percentages—was all expressed in terms of the same unadjusted data. If it was not, that was a matter to be elicited on cross-examination or in rebuttal. It is not a reason to discount the CAC data entirely as Pacific Bell asks us to do.

Pacific Bell also contends the CAC data only addressed the initial, mostly hand-delivery distribution[15] and failed to account for the success of the overall distribution. According to Pacific Bell, this means the CAC score cannot constitute substantial evidence that it breached its obligation to exercise best efforts and due diligence with respect to the overall distribution.

It is Pacific Bell's burden to demonstrate the insufficiency of the CAC evidence. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) The secondary distribution accounts for only about 20 percent of the directories distributed in each directory area on average. Approximately one million of the directories distributed in the secondary distribution are not delivered to customers but are left at public access sites to be picked up by whoever wants to take them. Pacific Bell admitted it had no way of knowing what became of these directories. Secondary delivery also included fulfillment

---

[15] About 7 percent of the initial distribution consists of common-carrier delivery to large users and mail delivery to residences and businesses for which hand-delivery is not feasible.

28

of telephone orders for directories, and delivering directories to new customers ("new connects"). While Pacific Bell offered evidence of limited redeliveries to some "lockout" sites during the secondary distribution, it did not establish its secondary delivery procedures were designed to or did cure failures in the initial distribution, and it did not introduce evidence quantifying or estimating how many redeliveries it carried out.[16] In fact, plaintiffs' expert on directory circulation practices, James Desser, testified that secondary delivery lacks any systems or procedures for identifying and correcting deficiencies in the initial distribution. While the initial distribution is intended to be comprehensive in scope, secondary distribution is "reactive" to call-in orders, new connects, and the numbers of directories picked up in public places. Finally, Pacific Bell points to no evidence showing why it would have been improper for the jury to infer the secondary distribution in each directory area was performed with the same level of effort as the initial distribution, since it was conducted by the same distribution vendor and overseen by the same Pacific Bell personnel as the initial distribution.

For these reasons, we find Pacific Bell fails to demonstrate the CAC survey data and other evidence discussed above was insufficient to support the verdict that Pacific Bell breached its contractual best efforts obligation.

**E.** *Excessive Damages*

Based on the following assertions, Pacific Bell seeks a new trial on damages or, in the alternative, a reduction by 11/12 in the amount of the judgment: (1) the jury calculated damages for each directory using the CAC scores which reflect only the hand-delivery phase of the distribution; (2) the advertising contracts were for one-year terms, providing for monthly billing; (3) the hand-delivery phase is completed within the first month or so after publication, while the secondary distribution continues over the balance of each directory's in-service year; and (4) plaintiffs failed to prove any delivery failures in the hand-delivery phase were not cured at some point in the next 11 months of the

---

[16] Although there was testimony Pacific Bell made redeliveries to persons who said they received no directory on the CAC survey, CAC sampled only 0.2 percent of Pacific Bell's customers in a delivery area.

29

contract. According to Pacific Bell, plaintiffs' theory and the jury's damages award were premised on the erroneous assumption that a one-month *delay* in delivery should be considered for damages purposes as if it was a *failure of delivery* for the entire contract year.[17]

At the outset, we reject Pacific Bell's assertion that "[p]laintiffs did not present any evidence that delivery failures in the hand delivery phase remained uncured during the secondary distribution phase . . . ." As discussed in the previous section, plaintiffs offered unrebutted expert testimony that the secondary distribution included no procedures for identifying and correcting delivery failures occurring in the initial distribution. Pacific Bell's very detailed 2002 "Request for Proposal" to its prospective distribution vendors described the secondary distribution services it required in great detail without referencing any program to identify and deliver directories to customers missed in the initial distribution. A summary statement of Pacific Bell's distribution policy for California characterized the secondary delivery as encompassing "New Installations," "additional or replacement" directories supplied "upon request," and distributions through other channels such as access stands and pay phone stations.

The jury could reasonably infer from the evidence that Pacific Bell had no way to identify or provide directories to customers missed in the initial phase unless they happened to be part of the tiny population sample contacted by CAC, or called Pacific Bell to request a directory, or picked one up at a public access site. Secondary distribution methods that depended so heavily on customer initiative could not be expected to reach more than a small fraction of the customers missed during a poorly performed initial distribution. To the extent Pacific Bell did offer limited evidence of company-initiated redeliveries during the secondary distribution, it made no attempt to quantify these efforts or to afford the jury any rational way to take them into account in assessing damages. It was not plaintiffs' burden to do this. Significantly, while plaintiffs

---

[17] Pacific Bell does not explain the basis for its apparent assumption that all directories were delivered to customers missed during the hand-delivery phase in the first month of the secondary distribution.

backed up their damages model with expert testimony, Pacific Bell offered no expert testimony of its own substantiating any alternative damages theory, including the one proposed in this appeal. Finally, as *Ammari I* found, there was "overwhelming evidence" Pacific Bell relied on CAC delivery verification surveys to measure the effectiveness of its third party distribution vendor's performance and for other purposes, and that Pacific Bell required its distribution vendor to ensure that at least 96 percent of the telephone customers in each directory district receive a directory *as measured by the CAC scores*. If the secondary distribution was as effective in curing missed deliveries as Pacific Bell now contends, it is not at all clear why Pacific Bell and others in the industry would have placed as much reliance on CAC scores (or similar delivery verification surveys) as they did, or why the surveys would have been conducted immediately after the initial distribution was completed instead of waiting until the effect of the secondary distribution would be reflected in the results.

There was thus ample evidence in the record from which the jury could infer the secondary distribution did not cure shortfalls in the initial distribution effort. In the end, Pacific Bell failed to persuade the jury otherwise. The jury even ignored plaintiffs' proposal, made in closing argument, that it reduce their damage awards by 18 percent across the board if jurors felt the CAC data did not adequately take the secondary distribution into account. Although the jury did not make that adjustment, it did award plaintiffs substantially less than the lowest amount of damages they had requested, as pointed out in *Ammari I*. For the reasons stated, we find Pacific Bell's present challenge to the jury's award unsubstantiated by the record.

### III. DISPOSITION

The judgment is affirmed.

31

_____
Margulies, Acting P.J.

We concur:


_____
Banke, J.


_____
Becton, J.*


_____
 * Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.